# STATE OF CONNECTICUT *v.* DANIEL COOK
## (SC 17995)

Rogers, C. J., and Norcott, Palmer, Zarella and Schaller, Js.

Argued January 2—officially released June 3, 2008

238

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Marc R. Durso*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following an incident in which the defendant, Daniel Cook, allegedly threatened another person with a table leg, a jury found him guilty of carrying a dangerous weapon in violation of General Statutes §§ 53-206 (a)[1] and 53a-3 (7).[2] The trial court rendered

---

[1] General Statutes § 53-206 (a) provides in relevant part: "Any person who carries upon his or her person any BB. gun, blackjack, metal or brass knuckles, or any dirk knife, or any switch knife, or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, or stiletto, or any knife the edged portion of the blade of which is four inches or over in length, any police baton or nightstick, or any martial arts weapon or electronic defense weapon, as defined in section 53a-3, or any other dangerous or deadly weapon or instrument, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ."

[2] General Statutes § 53a-3 provides in relevant part: "Except where different meanings are expressly specified, the following terms have the following meanings when used in this title:

judgment in accordance with the jury verdict,[3] and the defendant appealed.[4] On appeal, the defendant claims that (1) the trial court improperly failed to instruct the jury that the state was required to prove that the defendant's use or threatened use of the table leg constituted a "true threat," that is, a serious expression of an intent to commit an act of unlawful violence against another, and (2) because the evidence adduced at trial was insufficient to support such a finding, he is entitled to a judgment of acquittal. We agree with the defendant's claim of instructional impropriety but disagree with his claim of evidentiary insufficiency. We therefore reverse the judgment of conviction and remand the case for a new trial.

The jury reasonably could have found the following facts. In 2004, the defendant, a sixty-two year old man with mental and emotional problems, had been living in an apartment building located at 71 Truman Street in Bridgeport for approximately six years. In March,

* * *

"(7) 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

We note that, although § 53-206 is not contained in the same title as § 53a-3 (7), this court has used the definition of the term "dangerous instrument" set forth in § 53a-3 (7) to guide our interpretation of that term for purposes of other titles of the General Statutes when, as in the present case, to do so is not inconsistent with the statutory language at issue. See *State* v. *Ramos*, 271 Conn. 785, 796–97, 860 A.2d 249 (2004) ("even though the 'approved' definition of dangerous instrument in § 53a-3 [7] applies only to the provisions of title 53a, it guides our interpretation of the [term] as used in [General Statutes] § 29-38 because it is not inconsistent with any statutory language in § 29-38"). In light of this prior precedent, the defendant has acknowledged that the definition of the term "dangerous instrument" contained in § 53a-3 (7) is applicable to § 53-206.

[3] The trial court sentenced the defendant to a term of imprisonment of three years, execution suspended after one year, and five years probation.

[4] The defendant appealed to the Appellate Court from the trial court's judgment, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

2004, Peter DelFranco, who then was seventy-one years old, moved into the apartment next door to the defendant. The two men got along well at first, but the relationship between them soon soured. In mid-April, DelFranco placed the first of numerous calls to the Bridgeport police complaining that he was being kept awake at night by the sound of water running in the defendant's bathroom, and by a radio, which he could hear through the "paper" thin walls separating the defendant's and DelFranco's apartments. Police who responded to the calls informed DelFranco that there was nothing that they could do and that he should complain to the building manager, which he did. Around this time, DelFranco commenced a petition drive among the other residents of the building to have the defendant evicted, and, thereafter, the landlord commenced a summary process action against the defendant. An attorney friend of DelFranco told him that if the defendant were to be arrested for some reason, that fact could be used against him in the eviction proceeding.

In the afternoon on June 28, 2004, DelFranco was in his apartment when a neighbor knocked on his door and informed him that the defendant was riding the building elevator with a wooden table leg in his hand. DelFranco immediately went out into the hallway and sat down in a chair located near the elevator to wait for the defendant. Soon thereafter, the elevator door opened, and the defendant appeared, carrying the table leg. DelFranco told the defendant, "[t]hat's a weapon because you got a piece of metal sticking out the top of it." While waving the table leg, the defendant responded, "[t]his is for you if you bother me anymore." DelFranco asked the defendant to repeat what he had said and then asked him, "[w]hat are you shaking that at me for?" DelFranco then told the defendant that if he did "it again . . . [he would] call the police." The defendant laughed at DelFranco and again waved the table

leg. According to DelFranco, he then went into his apartment and, with the door to his apartment open, called the police. Upon returning to the hallway, DelFranco resumed his seat near the elevator and observed that the defendant was still there, "waving" the table leg.

Shortly thereafter, Bridgeport police officer Eric Norton was dispatched to 71 Truman Street in response to a call that, according to the police, had been placed by the defendant, not DelFranco. Upon arriving, Norton proceeded to the defendant's apartment, where the defendant informed Norton that DelFranco previously had threatened him with a gun and had waved a cane at him earlier in the day.[5] Norton next spoke to DelFranco, who still was sitting in the hallway. DelFranco told Norton that he and the defendant were engaged in an ongoing dispute and that, earlier in the day, the defendant had waved a table leg at him and had threatened to hit him with it. Norton then went back to speak with the defendant, who told Norton that he carried the table leg for protection. Norton spoke to another building resident, Ralph A. Defeo, who informed him that, although he had not heard the defendant make any threatening remarks to DelFranco, he had seen him earlier in the day waving the table leg.[6]

The defendant subsequently was arrested and charged with threatening in the second degree in violation of General Statutes § 53a-62 (a) (1), carrying a dangerous weapon in violation of §§ 53-206 (a) and 53a-3 (7), and disorderly conduct in violation of General Statutes § 53a-182 (a) (1). The case proceeded to a jury trial. At the close of the state's evidence, the trial court

[5] According to the defendant, DelFranco had threatened him physically on several occasions, including once with a gun and once with a baseball bat. Between April and June of 2004, the defendant called the police several times to report DelFranco's alleged threats.

[6] At trial, however, Defeo testified that, although he had seen the defendant carrying the table leg on June 28, 2004, he never saw him wave it at anyone.

granted the defendant's motion for a judgment of acquittal with respect to the disorderly conduct charge. Thereafter, the jury found the defendant not guilty of the charge of threatening in the second degree and guilty of the charge of carrying a dangerous weapon. This appeal followed.

## I

The defendant first claims that the trial court's jury instructions were constitutionally deficient. Specifically, the defendant contends that because, under §§ 53-206 and 53a-3 (7), the state must establish that he used the table leg in a threatening manner, the trial court was required to instruct the jury that it could not find the defendant guilty as charged unless it found that the defendant's conduct constituted a "true threat." In support of his claim, the defendant maintains that, unless that judicial gloss is placed on §§ 53-206 and 53a-3 (7), the offense of carrying a dangerous weapon is constitutionally overbroad[7] in violation of the first and fourteenth amendments to the United States constitution.[8] The defendant further claims that the trial court's failure to instruct the jury in that manner was harmful error. We agree with the defendant.[9]

---

[7] The defendant also asserts that the crime of carrying a dangerous weapon under §§ 53-206 and 53a-3 (7) is facially vague. The defendant, however, has not articulated how his facial vagueness claim differs in any way from his overbreadth claim. We therefore consider the latter claim only.

[8] The first amendment to the United States constitution, which is made applicable to the states through the due process clause of the fourteenth amendment; e.g., *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996); provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

[9] Because the defendant's claim is unpreserved, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant may prevail on unpreserved claims only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness

Before turning to the merits of the defendant's claim, we set forth the trial court's jury instructions with respect to the charge of carrying a dangerous weapon. The court instructed the jury in relevant part: "In count two of the information, [the defendant] is charged with carrying a dangerous weapon. Under § 53-206 . . . a person is prohibited from carrying on his person a dangerous instrument. In order for you to find the defendant guilty of this charge, the state must prove two elements beyond a reasonable doubt. [First] a dangerous instrument existed. If you find that a dangerous instrument existed, you must also find that . . . [the] dangerous instrument was carried on the person of the defendant on June 28, 2004.

"I will now review those two elements with you. The first element the state must prove beyond a reasonable doubt is that a dangerous instrument existed. I charge you that the table leg that is in evidence . . . is not a dangerous instrument per se. Whether or not the table leg became a dangerous instrument in this case is a question of fact for you to decide, a fact which the state must prove beyond a reasonable doubt.

"If you find [that] the table leg was threatened to be used by the defendant in this case, you must consider the table leg's potential for serious physical injury in conjunction with the manner and circumstances of its threatened use. A dangerous instrument is defined by . . . § 53a-3 (7). That statute provides that a dangerous

---

of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 359–60, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). The defendant's claim is reviewable because the first two prongs of *Golding* are met. For the reasons set forth hereinafter, we also conclude that the defendant is entitled to prevail under the second two prongs of the *Golding* test.

instrument means any instrument which, under the circumstances in which it was threatened to be used, was capable of causing serious physical injury. Any item, even if harmless under normal use, may be found . . . to be a dangerous instrument if, under the circumstances of its threatened use, it is readily capable of causing serious physical injury.

"The term 'serious physical injury' is also defined by a specific statute . . . . Section 53a-3 (4) . . . provides that a serious physical injury means physical injury which creates a substantial risk of death or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ. If you find beyond a reasonable doubt that the table leg was a dangerous instrument due to the circumstances of its threatened use by the defendant, you may move on to the second element.

"The state must also prove beyond a reasonable doubt that the dangerous instrument was carried on the person of the defendant. In other words, you must be satisfied that the defendant had physical possession of a dangerous instrument. If you find that the state has proven beyond a reasonable doubt both of the elements of carrying a dangerous weapon, then you shall find the defendant guilty. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt either one of the elements, you shall . . . find the defendant not guilty. . . ."[10]

The law governing the defendant's claim is well established. "A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to

---

[10] The defendant raised several objections to the court's instructions. Those objections, however, are not directly relevant to the constitutional issue that the defendant raises on appeal.

invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. . . . A [defendant] may challenge a statute as facially overbroad under the first amendment, even if the [defendant's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute. . . . Thus, the [defendant] has standing to raise a facial overbreadth challenge to the [statute] and may prevail on that claim if he can establish that the [statute] reaches a substantial amount of constitutionally protected conduct even though he personally did not engage in such conduct." (Internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 167, 827 A.2d 671 (2003).

It is well established that this court has a duty "to construe statutes, whenever possible, to avoid constitutional infirmities . . . ." (Citation omitted; internal quotation marks omitted.) *Denardo* v. *Bergamo*, 272 Conn. 500, 506 n.6, 863 A.2d 686 (2005); see also *State* v. *Indrisano*, 228 Conn. 795, 805, 640 A.2d 986 (1994) ("in evaluating [a] defendant's challenge to the constitutionality of [a] statute, we read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it"). "[W]hen called [on] to interpret a statute, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991). This principle directs us to "search for a judicial gloss . . . that will effect the legislature's will in a manner consistent with constitutional safeguards." Id.

Our application of these principles in *State* v. *DeLoreto*, supra, 265 Conn. 145, guides our resolution of the present case. In *DeLoreto*, the defendant, Dante DeLoreto, was charged with two counts of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a)[11] after he allegedly confronted and threatened Wethersfield police officers on two separate occasions. Id., 148–50. After a court trial, the court found DeLoreto guilty of both counts. See id., 151. DeLoreto appealed, claiming, inter alia, that § 53a-181 (a) was unconstitutionally overbroad because his convictions were based on protected speech. Id., 151–52. The state asserted that DeLoreto's offending statements had constituted true threats. Id., 152. In agreeing with the state, we explained the principles underlying the true threats doctrine that previously had been set forth by the United States Supreme Court in *Virginia* v. *Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). See *State* v. *DeLoreto*, supra, 152–56. "The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The

[11] General Statutes § 53a-181 (a) provides: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

[f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .

"Thus, for example, a [s]tate may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . Furthermore, the constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except [when] such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . . And the [f]irst [a]mendment also permits a [s]tate to ban a true threat. . . .

"True threats encompass those statements [when] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . *Virginia* v. *Black,* [supra, 538 U.S. 358–60; see also, e.g., *In re Douglas D.,* 243 Wis. 2d 204, 230–31, 626 N.W.2d 725 (2001) (" '[T]rue threat' is a constitutional term of art used to describe a specific category of unprotected speech. . . . This category, although often inclusive of speech or acts that fall

within the broader definition of 'threat,' does not include protected speech. . . . Therefore, states may, consistent with the [f]irst [a]mendment, prohibit all 'true threats.' " [Citations omitted.])].

"The United States Court of Appeals for the Fifth Circuit has articulated the rationale underlying the removal of true threats from first amendment protection. The notion that some expression may be regulated consistent with the first amendment . . . starts with the already familiar proposition that expression has special value only in the context of dialogue: communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . . It is not plausible to uphold the right to use words as projectiles [when] no exchange of views is involved. . . . *Schackelford* v. *Shirley*, 948 F.2d 935, 938 (5th Cir. 1991), quoting L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-8, pp. 836–37.

"That court further stated that, [a]s speech strays further from the values of persuasion, dialogue and free exchange of ideas the first amendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts, the state has greater latitude to enact statutes that effectively neutralize verbal expression. *Schackelford* v. *Shirley*, supra, 948 F.2d 938. Finally, that court concluded that, as expansive as the first amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection. Id. Thus, [one] must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a

mere joke, which are protected. See *Watts* v. *United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (statement that speaker would shoot president of United States made at political rally constituted protected political hyperbole).

"In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . Although a threat must be distinguished from what is constitutionally protected speech . . . this is not a case involving statements with a political message. A true threat, [when] a reasonable person would foresee that the listener will believe he will be subjected to physical violence [on] his person, is unprotected by the first amendment. . . . *United States* v. *Orozco-Santillan*, 903 F.2d 1262, 1265–66 (9th Cir. 1990) (applying 18 U.S.C. § 115, which prohibits threatening to assault federal law enforcement officer). Moreover, [a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners. Id., 1265." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 153–56.

Finally, in *DeLoreto*, we explained that, in the absence of a judicial gloss interpreting § 53a-181 (a) as applying only to true threats, the provision could be construed as unconstitutionally overbroad. Id., 166. We therefore recognized that such a gloss was necessary to save the statute from constitutional infirmity. Id., 166–67; see also *State* v. *Skidd*, 104 Conn. App. 46, 55, 932 A.2d 416 (2007) (observing that *DeLoreto* "acknowledged that in order for a threat to be prohibited by statute in Connecticut, that threat must rise to the level of a 'true threat' ").

In the present case, the state alleged that the defendant had violated § 53-206 by carrying a dangerous instrument within the meaning of General Statutes § 53a-3 (7), which defines a dangerous instrument in relevant part as "any instrument . . . which, under the circumstances in which it is *used* or . . . *threatened* to be used, is capable of causing death or serious physical injury . . . ." (Emphasis added.) Thus, for purposes of the present case, the state was required to establish that the defendant's conduct in waving the table leg, or the defendant's conduct coupled with his remarks, rendered the table leg a dangerous instrument for purposes of §§ 53-206 and 53a-3 (7). Under this court's decision in *DeLoreto*, however, the defendant was entitled to an instruction that he could be convicted as charged only if his statements or use of the table leg constituted a true threat, that is, a threat that would be viewed by a reasonable person as one that would be understood by the person against whom it was directed as a serious expression of an intent to harm or assault, and not as mere puffery, bluster, jest or hyperbole. See *State* v. *DeLoreto*, supra, 265 Conn. 155–56; see also *State* v. *Johnston*, 156 Wash. 2d 355, 363, 127 P.3d 707 (2006) (unless statute proscribing bomb threats "is given a limiting instruction so that it proscribes only true threats, it is overbroad"); *State* v. *Perkins*, 243 Wis. 2d 141, 151, 626 N.W.2d 762 (2001) (unless statute proscribing threats against judges is given limiting instruction so that it proscribes only true threats, it is unconstitutional). Because the circumstances surrounding the alleged threat are critical to the determination of whether the threat is a true threat, the trial court also should have instructed the jury to consider the particular factual context in which the allegedly threatening conduct occurred, which, in the present case, would include DelFranco's reaction to it and the defendant's actions before and after his allegedly threatening conduct.

Because the trial court's jury charge contained no reference to the requirement of a true threat—in other words, because the court's instructions did not include the judicial gloss on §§ 53-206 and 53a-3 (7) that is necessary under *DeLoreto*—the jury could have found the defendant guilty on the basis of conduct that did not rise to the level of a true threat. Consequently, under the trial court's instructions, the jury's finding of guilty could have been predicated on expressive conduct protected by the first amendment.

The state asserts that the crime of carrying a dangerous weapon, with which the defendant had been charged in the present case, does not implicate the first amendment because it "does not strike against pure speech . . . but rather various combinations of physical conduct plus speech," and because "[s]peech that, by its very utterance," conveys a threat to use an object in a manner capable of causing serious physical injury automatically falls within the category of unprotected true threats. With respect to the state's first assertion, it is well established that "[t]he [f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 154. The state's second assertion begs the question to be answered by the jury upon applying the true threats doctrine. Under the state's reasoning, a batter in a softball game who jokes that she is going to hit the pitcher over the head with her bat unless he throws her an easy pitch to hit could be found guilty of carrying a dangerous weapon pursuant to a jury instruction that does no more than mirror the literal language of §§ 53-206 and 53a-3 (7). As this hypothetical illustrates, the first amendment would be seriously eroded if we were to adopt the state's view that any statements or conduct conveying a threat to use an otherwise innocuous item in a manner capable of causing serious physical injury

may fall within the purview of §§ 53-206 and 53a-3 (7) irrespective of whether the threat reasonably may be characterized as a true threat. As a general matter, moreover, whether such expressive conduct represents a true threat is to be decided by the jury. See, e.g., *United States* v. *Malik*, 16 F.3d 45, 51 (2d Cir.), cert. denied, 513 U.S. 968, 115 S. Ct. 435, 130 L. Ed. 2d 347 (1994); *United States* v. *Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983), cert. denied, 467 U.S. 1228, 104 S. Ct. 2683, 81 L. Ed. 2d 878 (1984). We therefore agree with the defendant that the trial court improperly failed to instruct the jury that it could not find the defendant guilty of carrying a dangerous weapon under §§ 53-206 and 53a-3 (7) unless it found, on the basis of the defendant's conduct or statements, that his alleged threat to use the table leg constituted a true threat and not simply idle talk, banter or some other form of protected expression.

It is well established that a "defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled." (Internal quotation marks omitted.) *State* v. *Spillane*, 255 Conn. 746, 757, 770 A.2d 898 (2001). "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *Neder* v. *United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); accord *State* v. *Gerardi*, 237 Conn. 348, 362, 677 A.2d 937 (1996). The defendant contends that the instructional error was not harmless beyond a reasonable doubt.

Although, as we have explained, the state disputes that the trial court's instructions on the charge of carrying a dangerous weapon were improper, the state

does not claim that those instructions, if constitution-
ally defective, were harmless beyond a reasonable
doubt. We also see no reason to disagree with the defen-
dant's contention that the instructions were harmful.
In light of the history between the defendant and Del-
Franco, and DelFranco's conduct before, during and
after the defendant's allegedly unlawful use of the table
leg, a properly instructed jury could have found that a
reasonable person in the defendant's position would
not have foreseen that his statements and actions would
be interpreted by DelFranco as a serious expression of
an intent to harm but, rather, as mere banter, jest or
exaggeration. Accordingly, the defendant's conviction
of carrying a dangerous weapon cannot stand.

## II

The defendant next claims that he is entitled to a
judgment of acquittal because the evidence was insuffi-
cient to permit a finding that his conduct (1) was a true
threat rather than constitutionally protected hyperbole,
puffery or bravado, and (2) constituted a present threat,
as distinguished from a future threat, to use the table
leg in a manner capable of causing serious physical
injury. We reject both of the defendant's claims.

## A

We first address the defendant's contention that no
reasonable juror, aware of the relationship between
the defendant and DelFranco, could conclude that a
reasonable person in the defendant's position should
have foreseen that DelFranco would have interpreted
the defendant's conduct as a serious expression of an
intent to harm. In support of his claim, the defendant
places particular reliance on DelFranco's reaction to
the defendant's alleged misconduct as demonstrating
that DelFranco himself did not take the defendant seri-
ously. In particular, the defendant relies on the fact that
DelFranco left his front door open when he entered his

apartment to call the police, that he returned to the hallway after doing so, and that he waited with the defendant until the police arrived. The defendant contends that, at most, the evidence reveals "a rather pathetic history of problems between two older men who apparently had trouble living next to one another . . . ." The defendant further notes that it was Del-Franco, rather than the defendant, who initiated the altercation between the two men by confronting the defendant about his possession of the table leg, and that DelFranco appeared to goad the defendant into using the table leg in an aggressive manner.

"The standard of review we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 808, 911 A.2d 1099 (2007). In *DeLoreto*, however, we explained that "[t]his [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases [in which] that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the [f]irst

[a]mendment . . . protect. . . . We must [independently examine] the whole record . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We recently have reiterated this de novo scope of review in free speech claims in *DiMartino* v. *Richens,* 263 Conn. 639, 661–62, 822 A.2d 205 (2003) . . . ." *State* v. *DeLoreto,* supra, 265 Conn. 152–53.

We conclude that the evidence was sufficient to support a finding that a reasonable person in the defendant's position would have foreseen that the defendant's statements and actions would be interpreted by DelFranco as a serious expression of an intent to harm. It is true, as the defendant claims, that Del-Franco's reaction to the defendant's conduct suggests that he was not genuinely concerned for his safety, despite the history between DelFranco and the defendant. It also is true that a juror, apprised of all the relevant facts, reasonably could conclude that the defendant's actions were nothing more than mere puffery or bravado, prompted by DelFranco's own provocative behavior toward the defendant. Nevertheless, a reasonable juror also could find, on the basis of this same evidence, that the defendant appeared to have reached his breaking point and intended to take strong action against DelFranco if DelFranco did not stop "bother[ing]" him. Moreover, the defendant himself acknowledged that he carried the table leg for use as a weapon, albeit in self-defense. Because the defendant's statement that "[t]his [table leg] is for you if you bother me anymore" constitutes a threat, "[t]he question then becomes whether a reasonable person would have believed that the [threat], taken in context, [was] mere hyperbole or [a joke] and, thus, protected by the first

amendment." Id., 156–57. In light of the troubled relationship between DelFranco and the defendant, and the real potential for volatility created by their ongoing and contentious disputes, we cannot say that the evidence necessarily was insufficient to support a finding that the defendant's statements and conduct amounted to a true threat.[12]

B

The defendant also claims that he is entitled to a judgment of acquittal because the evidence failed to establish that his threatened use of the table leg constituted a present threat, rather than a future threat, to use the table leg in a manner capable of causing serious physical injury. In support of this claim, the defendant contends that "to prove a crime based on a present threat, the state must prove that the threat is one to cause injury at the same time and place where the accused makes the threat. . . . Otherwise there would be no distinction between crimes based on present threats and those based on future threats." (Citation omitted.) The defendant further asserts that, "[a]t most, the state's evidence showed . . . that [the] defendant allegedly threatened to use the table leg at some time in the future and then only if . . . DelFranco continued to bother or threaten him."

The defendant has provided no authority, and we are aware of none, that the crime of carrying a dangerous weapon under §§ 53-206 and 53a-3 (7) requires proof of a threat to cause immediate physical harm to the

[12] The defendant also claims that his alleged threat was nothing more than an expression of his right to bear arms in self-defense. Although a reasonable juror could conclude that the defendant possessed the table leg only for defensive purposes, for the reasons that we previously have discussed, we reject the defendant's contention that the evidence required such a conclusion.

victim.[13] Although it is true, as the defendant maintains, that some crimes are characterized by the immediacy of the threat posed; see, e.g., *State* v. *Childree*, 189 Conn. 114, 123, 454 A.2d 1274 (1983) ("[t]he use or threatened use of immediate physical force is the element which distinguishes larceny from robbery"); there is nothing in the language of either § 53-206 or § 53a-3 (7) to suggest that the crime of carrying a dangerous weapon, as prohibited by those provisions, is one of them. Cf. General Statutes § 53a-62 (a) ("[a] person is guilty of threatening in the second degree when: (1) [b]y physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury"). Imminence, moreover, is not a requirement under the true threats doctrine. *State* v. *DeLoreto*, supra, 265 Conn. 158.

We also disagree with the defendant's assertion that there is an inadequate temporal relationship between the carrying of a particular object or instrument, and the threat to use it in a manner capable of causing serious physical injury, merely because the threat is conditioned on some future conduct by the target of the threat. As the defendant concedes, a threat, by definition, is an expression of an intent to cause some future harm.[14] Consequently, the defendant's threatened use

[13] The only case on which the defendant relies, *People* v. *Vasquez*, 136 Misc. 2d 1057, 1058–59, 519 N.Y.S.2d 624 (1987), is inapposite because it involved the crime of "menacing" in violation of New York Penal Law § 120.15, a crime similar to the offense of threatening under this state's penal code. In contrast to the crime of carrying a dangerous weapon, however, the crime of menacing under New York law requires proof that the defendant "intentionally place[d] or attempt[ed] to place another person in fear of imminent serious physical injury." N.Y. Penal Law § 120.15 (McKinney 1987). Accordingly, the defendant's reliance on *Vasquez* is misplaced.

[14] A threat is defined as "an indication of something impending and usu-[ally] undesirable or unpleasant . . . as . . . an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone . . . ." Webster's Third New International Dictionary.

of the table leg to inflict serious bodily injury against DelFranco, in the event that DelFranco continued to bother him, constitutes a violation of §§ 53-206 and 53a-3 (7) if the threat is found to be a true threat not protected by the first amendment.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.