STATE OF CONNECTICUT *v.* RUSSELL KIRBY
(AC 32562)

Lavine, Robinson and Lavery, Js.

Argued April 23—officially released July 24, 2012

*W. Theodore Koch III*, special public defender, with whom, on the brief, was *William T. Koch, Jr.*, special public defender, for the appellant (defendant).

*Lawrence J. Tytla*, supervisory assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Paul J. Narducci*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Russell Kirby, appeals from the 2010 judgment of conviction, rendered after a jury verdict, of kidnapping in the second degree in violation of General Statutes § 53a-94 and assault in the third degree in violation of General Statutes § 53a-61.[1] On appeal, the defendant claims that (1) the distinction

---

[1] Soon after the underlying facts of this case occurred in 2002, the defendant was charged with two counts of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), kidnapping in the second degree in violation of § 53a-94 and assault in the third degree in violation of § 53a-61. In 2004, a jury found the defendant guilty of kidnapping in the second degree and assault in the third degree, and the court, *Schimelman, J.*, sentenced him to twenty-one years in prison. Our Supreme Court, however, reversed the conviction pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and remanded the case for a new trial. See *State* v. *Kirby*, 280 Conn. 361, 908 A.2d 506 (2006).

between kidnapping and unlawful restraint is unconstitutionally vague as applied to him and (2) the trial court failed to temper the vagueness in the distinction in its charge to the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the incident, the victim, Leslie Buck, was a fifty-seven year old second grade teacher in the Stonington public school system.[2] She had been a teacher for more than thirty years and was a member of Alpha Delta Kappa (sorority), an honorary sorority for teachers. The sorority held dinner meetings at the Mystic Hilton on the first Thursday of the month, beginning at 6:30 p.m. and ending at approximately 8 p.m. On May 2, 2002, the victim attended a sorority meeting and left the Hilton shortly after 8 p.m. She informed her friend, Judith Barber, and others that, on her way home, she intended to take dessert to her elderly mother, Katherine Edmonson.

At approximately 10:30 p.m., Timothy Thornton, a Stonington patrol officer, was dispatched to the Buck residence at 77 Masons Island Road in Mystic after Charles Buck (Buck),[3] the victim's husband, telephoned the Stonington police department to report that the victim was late returning from the sorority meeting. After obtaining information from Buck, Thornton went in search of the victim at a supermarket and drugstore where she was known to shop. At approximately 10:45 p.m., Buck telephoned Barber and asked her if she knew the victim's whereabouts.[4] Barber told Buck that the

---

[2] The victim, now deceased, was unavailable to testify at trial. *State* v. *Kirby*, 280 Conn. 361, 363–64, 908 A.2d 506 (2006).

[3] Buck invoked his fifth amendment privilege against self-incrimination and did not testify at the defendant's trial.

[4] Barber was a retired first grade teacher who had known the victim for thirty-three years. The two women were friends and chatted nightly about their days' activities. Although Barber and Buck are cousins, she did not have any interaction with him. Other than on the night in question, Buck had never telephoned Barber. Buck asked Barber if she and the victim had

victim had intended to visit Edmonson, but Buck said he had driven past Edmonson's house, which was dark.

At 11:07 p.m., Buck again telephoned the Stonington police department to report that the victim had returned home. The dispatcher, Allyson Gomes, spoke with the victim and thought that she sounded upset. Gomes so informed Thornton, and he returned to the Buck residence. When he arrived, Thornton saw the victim's white Buick in the garage and found the victim crying hysterically in the kitchen. While he tried to calm the victim, Thornton observed that the victim's hair was in disarray, there were marks under her eyes, red marks around her wrists and that her stockings were torn at the knees. He summoned an ambulance. The victim took Thornton into the garage and described what had happened to her when she first returned from the sorority meeting. The victim complained of chest pains.

When the ambulance arrived, Jeremy Knapp, an emergency medical technician, interviewed and examined the victim. Knapp described the victim as distraught. She complained of pain in her wrists, hands, shoulders, the right side of her chest and stomach. The victim told Knapp that she had been kidnapped. According to Knapp, the victim had severe shoulder pain because her hands had been tied behind her back for a long time, her hands were swollen and bruised and she had abrasions on her knees. The victim's chest and stomach pain were the result of having been punched, and her knees were injured when she was thrown to the floor. The victim also had two small lacerations on the back of her neck at the base of her skull. The victim was taken via ambulance to Lawrence and Memorial Hospital in New London.[5]

gone to a casino. According to Barber, although she and the victim had once visited the casino, the victim "wasn't a casino person . . . ."

[5] After the victim left in the ambulance, Thornton stayed at the Buck residence to oversee the impounding of the Buick.

When the victim arrived at the hospital, she was calmer and able to tell Molly Cichon, an emergency room nurse, what had happened to her. The incident began in her garage when she first returned from the sorority meeting. She said that the red marks on the back of her neck were caused by a stun gun. Cichon noted bruises on the victim's neck and petechiae on her face suggestive of strangulation,[6] lacerations on her foot and abrasions on her legs and hands. The victim reported that her hands had been bound, which was consistent with the injuries to her hands and wrists. The victim was concerned about her ribs, but X rays revealed no broken bones. The victim was discharged from the hospital at 3 a.m. on May 3, 2002.[7]

The victim again met with Thornton and other officers to explain her concern for Edmonson's safety, as the defendant had taken the victim's key ring, which included a key to Edmonson's home. The police conducted security checks at both the Edmonson and Buck residences.

While the victim was being examined at the hospital, the police identified the defendant as a suspect. They had reason to believe that the defendant was on foot and searched unsuccessfully for his pickup truck in the vicinity of the Buck residence. After Thornton and Sergeant Keith Beebe, patrol supervisor, and other officers secured the homes of the victim and Edmonson, they met an officer from the Ledyard police department and proceeded to the defendant's home on an unlit, unpaved road in a rural area of Ledyard.

---

[6] The victim was photographed by Cody Floyd, a Stonington police detective, at the police station on the evening of May 3, 2002. At trial, Floyd testified as follows with regard to a photograph he took: "This is the face of [the victim, and] . . . there was a small injury to her chin, and then areas of petechiae hemorrhages around her eyes and general area of her face."

[7] Sherry Castodio, a friend and teaching colleague, saw the victim at school the next day. The victim's face was red and blotchy, her hands were swollen and the skin over her knuckles was taut.

The five officers arrived at the defendant's home at approximately 4:30 a.m. on May 3, 2002. The defendant was dressed in street clothes when he promptly answered Thornton's knock on the door. Although he was asked to step outside, the defendant invited the officers into his home. When Beebe asked the defendant if he knew why the officers were there, the defendant stated, "yes." The defendant also stated, "yes," when asked whether he had tied up the victim and driven her around and, when asked why he did so, stated that he "needed the money." He also stated that he was sorry, he had not intended to harm the victim and he "believed that he had a problem." He also told the police that he had entered the victim's garage through an unlocked breezeway door. When asked, the defendant told Beebe that the victim's key ring was on his kitchen counter. Bryan Schneider, a patrol officer, took custody of the key ring.[8] Beebe placed the defendant under arrest and advised him of his *Miranda* rights.[9] Schneider hand-cuffed the defendant and took him to the Stonington police department at approximately 5 a.m.

At the police department, Schneider advised the defendant again of his rights and prepared a waiver of rights form for him to sign. Although the defendant had cooperated with the police in his home, he did not cooperate with them at the police station. He refused to sign the advisement of rights form and stated that he knew that he had done wrong and "didn't want to go round and round with [the police] with a state-ment . . . ."

David Knowles, a detective sergeant with the Stonington police department, searched the victim's Buick. On the floor behind the operator's seat, Knowles found a

---

[8] The key ring was readily identifiable to the police because the victim had informed them of distinctive trinkets on it.

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

green canvas bag, United States Army issue, that contained a United States Army issue .45 caliber Colt 1911 pistol, a magazine for the pistol that contained seven live rounds, two electronic stun guns, pieces of rope, a blue rubber ball, a clear plastic bottle containing liquid, a hickory log, two pairs of men's eyeglasses and a pair of eyeglasses that were identified by a Stonington optician, Clayton Cobb, as belonging to the victim. The bag also contained bandanas and several pairs of white cotton gloves similar to items found in the defendant's residence. Pursuant to a search of the defendant's home on May 7, 2002, the police seized a case for the Colt 1911 pistol and instructions for the stun gun found in the green bag in the Buick. The defendant was charged with a number of crimes. See footnote 1 of this opinion.

Debra Turner, one of the defendant's neighbors, testified that on May 2, 2002, she went to the defendant's home at 7:45 p.m., to take him a plate of food. Although the defendant usually wore jeans, a T shirt or flannel shirt, and a bandana around his head, that night he was dressed to go out and was wearing his toupee. When Turner took food to the defendant, she usually sat with him to talk and have a beer, but on that occasion, the defendant hustled her out of the house, telling her that his brother was coming.[10]

The defendant testified that he was a longtime friend of Buck. Shortly before May 2, 2002, Buck had given the defendant a check in the amount of $760, drawn on a joint account of Charles Buck and Leslie Buck, as payment for having cleared some land. The defendant disliked being paid from joint accounts.

The defendant testified that on May 2, 2002, he left home at 6:10 p.m. to mail some letters and to work on

---

[10] The defendant's brother, Stratton Kirby, lived in California but was in Connecticut on May 2, 2002, on business. He had lunch with the defendant and spent the afternoon with him. He did not see the defendant in the evening.

a bulldozer that was stored outdoors.[11] He dressed up despite the fact that it was raining. The defendant also testified that while he was driving his truck through downtown Mystic, his truck stalled after he drove through a puddle. He worked on the truck for one hour but was not able to jump-start it with his stun guns, so he took his green bag and walked to the Buck residence to get help.

He further testified that he arrived at the Buck residence at approximately 8:30 p.m. and entered through a door to the breezeway. No one was at home so he sat on the stairs in the garage. Ten minutes later the garage door opened, and the victim sped in and skidded to a stop. When the victim saw him, she "exploded," complaining about the $760 check. The victim, who was wearing high heels and had a large set of keys in her right hand and a red pocketbook in the other, began to beat the defendant and chase him around her Buick. When there was nowhere for the defendant to go, he wrestled the victim to the ground. He tried to Taser the victim in the back to see if she would slow down, but the Taser had no effect. The defendant then took a piece of cotton clothesline from a bench and tied the victim's hands behind her back. The defendant also testified that he and the victim then agreed to talk to Buck, who supposedly was at a local bar, to settle their dispute over the money. The defendant got the victim off the floor and placed her, still bound, into the Buick. Rather than look for Buck, the defendant took a circuitous route to his home so he could get parts to repair his truck. The trip took twenty minutes.

When he was sure that the victim had calmed down, the defendant untied her hands. The defendant gathered

---

[11] Thomas Cleveland testified that he had hired the defendant to repair an old bulldozer that he owned. The defendant testified that the objects in his green bag were intended to distract a dog on Cleveland's property that was bothering him. Cleveland testified that the dog belonged to his son and was not kept on his property.

the parts he needed to repair his truck and showed the victim his coin collection. The defendant and the victim then got into the Buick and the defendant continued his circuitous driving. As the defendant was traveling on Interstate 95 near exit eighty-nine, he heard a noise and thought there was a piece of metal in the rear tire. He stopped underneath an overpass, turned off the engine, took the keys and got out to look at the rear of the Buick. As he approached the back of the vehicle, the car sped away.[12] According to the defendant, he walked for more than one hour to Mystic where he repaired his truck and then went home to bed. The defendant testified that he had tied up the victim only to prevent her from assaulting him and that he had no money problems.

At trial, the defendant moved to dismiss the count of kidnapping in the second degree because, he alleged, given the facts in the case, the statutory definitions of the crimes of kidnapping in the second degree and unlawful restraint in the first degree were "anything but clear and unequivocal." The trial court denied the motion but granted the defendant's request to instruct the jury on unlawful restraint in the first degree as a lesser included offense. The jury found the defendant guilty of kidnapping in the second degree and assault in the third degree. The court sentenced the defendant to twenty-one years in prison. The defendant appealed.

I

The defendant's first claim is that the difference between kidnapping in the second degree pursuant to § 53a-94 (a)[13] and unlawful restraint in the first degree

[12] During her telephone conversation with Gomes, the victim stated that she used a spare key she kept in her purse to start the Buick. Those facts were not before the jury.

[13] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

General Statutes § 53a-91 (2) provides: " 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding

pursuant to General Statutes § 53a-95 (a)[14] is unconstitutionally vague as applied to him.[15] See *State* v. *Salamon*, 287 Conn. 509, 604, 949 A.2d 1092 (2008) (*Zarella, J.*, concurring in part and dissenting in part) ("[o]ur case law has recognized that, under certain factual circumstances, unlawful restraint in the first degree may constitute a lesser included offense of the crime of kidnapping in the first or second degree"). The defendant claims that the difference between the intent to *abduct* the victim to prevent her liberation, which is required for kidnapping in the second degree, and the intent to *restrain* the victim to interfere substantially with her liberation, which is required for unlawful restraint in the first degree, is ambiguous. He further claims that the crucial difference between kidnapping in the second degree and unlawful restraint in the first degree, as applied to him, is whether he intended to *abduct* the victim to prevent her liberation or whether he intended to *restrain* the victim to substantially interfere with her liberty. See footnotes 13 and 14 of this opinion. Although the defendant's brief provides a

him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

[14] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

General Statutes § 53a-91 (1) provides in relevant part: " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent. . . ."

[15] In his brief, the defendant states: "The crux of this appeal is whether it is just to sentence a seventy-two year old man with no other criminal record, who 'worked throughout his life' . . . to twenty-one years in prison, when the difference between a twenty-one year sentence and a six year sentence is whether he intended to prevent [the victim's] liberation, or whether he intended to interfere substantially with her liberty." (Citation omitted.) We note that the defendant does not challenge the sufficiency of the evidence.

lengthy and detailed analysis of our Supreme Court's several efforts to distinguish abduct from restrain pursuant to the relevant statutes,[16] he cannot prevail because he failed to demonstrate that the language of the kidnapping statute, § 53a-94 (a), was unconstitutionally vague as applied to him, given the facts of this case.

The de novo standard of review is applicable when an appellate court is deciding whether a statutory provision is unconstitutionally vague. See *State* v. *Knybel*, 281 Conn. 707, 713, 916 A.2d 816 (2007). As our Supreme Court has instructed, when reviewing a claim of vagueness, we are required first "to restate the common-law rule that everyone is presumed to know the law and that ignorance of the law excuses no one from criminal sanction." Id. "Our law requires that a penal statute define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [This concept] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . [T]he [most] important aspect of the vagueness doctrine is not actual notice . . . but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . ." (Internal quotation marks omitted.) Id., 713–14.

---

[16] The defendant analyzed the majority, concurring and dissenting opinions, as the case may be, in *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009); *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008); *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156, overruled in part by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), and superseded in part after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009); *State* v. *Salamon,* supra, 287 Conn. 509; and *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 (2002), overruled in part by *State* v. *Salamon*, 287 Conn. 509, 513–14, 949 A.2d 1092 (2008).

"[A] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature

[must] establish minimal guidelines to govern law enforcement." (Citation omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 759–60, 988 A.2d 188 (2010).

"[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." (Internal quotation marks omitted.) Id., 766. "Provided that conduct is of a sort widely known among the lay public to be criminal . . . a person is not entitled to clear notice that the conduct violates a *particular* criminal statute. It is enough that he [or she] knows that what he [or she] is about to do is probably or certainly criminal." (Emphasis in original; internal quotation marks omitted.) Id., 770–71.

Our Supreme Court has recognized the defendant's claim that there is ambiguity between the words abduct and restrain, as defined by our statutes. "[W]hen an individual intends to interfere substantially with another person's liberty, he also intends to keep that person from escaping, at least for some period of time; in other words, he intends to prevent that person's liberation. Thus, the point at which an intended interference with liberty crosses the line to become an intended prevention of liberation is not entirely clear.

"At least in a case not involving the secreting of a victim in a place that he or she is unlikely to be found; see General Statutes § 53a-91 (2) (A); it is the intent element *only* that differentiates an abduction—the sine qua non of the crime of kidnapping—from a mere unlawful restraint, and the relatively minor penalties attendant to the latter offense." (Emphasis in original.) *State* v. *Salamon,* supra, 287 Conn. 534.

Because our Supreme Court concluded that the language of §§ 53a-94 (a) and 53a-95 (a) does not elaborate on the intent element of the crimes, it looked to common-law kidnapping principles, the concerns addressed by the Model Penal Code and the history and development of modern kidnapping statutes. Id., 535–39. "Among the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the isolation of a victim from the protections of society and the law and the special fear and danger inherent in such isolation." Id., 536. The present day kidnapping statutes were drafted as part of a comprehensive revision of this state's criminal statutes that the General Assembly approved in 1969. Id., 541. The published commentary by the commission to revise the criminal statutes "indicates that the commission intended to create a new statutory scheme that recognized varying degrees of unlawful restrictions on a victim's liberty by drawing a distinction between a 'restraint,' which, standing alone, comprises the crime of unlawful restraint, and an 'abduction,' which comprises the crime of kidnapping." Id.

After examining the common law of kidnapping, the circumstances surrounding the enactment of the current kidnapping statutes and the policy objectives motivating them, our Supreme Court concluded that "[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a graduated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the

victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542.

"[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." (Emphasis in original.) Id., 547–48.

We conclude that, on the basis of the evidence, the jury reasonably could have found beyond a reasonable doubt that the defendant restrained the victim for a period of time longer than was necessary to commit the crime of assault in the third degree. See id., 542. The defendant used his stun gun on the victim and threw her to the garage floor and bound her hands

behind her back. His restraint of the victim, however, did not end at that time. The defendant by his own admission placed the victim in the Buick and drove circuitously to his residence located in a rural section of Ledyard. The defendant confined the victim in his house until they got back in the Buick and the defendant again drove circuitously throughout New London County. The jury reasonably could have found that the defendant restrained the victim's movements to prevent her liberation, to prevent her from summoning assistance and to avoid or reduce the possibility of detection for approximately two hours.[17] By binding the victim's hands behind her back, placing her in the Buick and driving for twenty minutes to his home, the defendant also increased the risk of harm to her aside and apart from the crime of assault in the third degree by preventing her from summoning aid while he was armed with a pistol. Moreover, the defendant himself admitted to the Stonington police that he knew that what he had done to the victim was wrong. Obviously, he knew his conduct as to the victim was criminal. See *State* v. *Winot*, supra, 294 Conn. 770–71. He was not entitled to clear notice that his conduct violated a particular criminal statute. See id.

We also conclude that the defendant has failed to demonstrate that he was the victim of arbitrary and standardless enforcement of § 53a-94, that he lacked notice that his conduct was criminal as to kidnapping in the second degree and that the statute was unconstitutionally vague as applied to him.

## II

The defendant's second claim is that the trial court's failure to temper the distinction between kidnapping

[17] The exact amount of time is unknown, but the facts demonstrate that the victim arrived home after her sorority meeting concluded at approximately 8 p.m. and that Buck telephoned the Stonington police department at 11:07 p.m. to report that the victim had returned home.

and unlawful restraint when it charged the jury rendered an unjust result. The state claims that the defendant cannot prevail on this claim because he invited the error by objecting to the court's intention to instruct the jury on the six *Salamon* factors; see *State* v. *Salamon*, supra, 287 Conn. 547–48; to determine whether his restraint of the victim was incidental to the crime of assault in the third degree. See id. We agree with the state that the claimed error, if any, was induced by the defendant; see *State* v. *Kitchens*, 299 Conn. 447, 468–69, 10 A.3d 942 (2011); and that he cannot prevail on appeal after his trial court strategy has failed him. See *State* v. *Castillo*, 121 Conn. App. 699, 716 n.17, 998 A.2d 177, cert. denied, 297 Conn. 929, 998 A.2d 1196, cert. denied, 562 U.S. 1094, 131 S. Ct. 803, 178 L. Ed. 2d 537 (2010).

"It is well settled that an instructional impropriety that is constitutional in nature is harmful beyond a reasonable doubt, and, thus a reversible impropriety, when it is shown that it is reasonably possible . . . that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 462, 978 A.2d 1089 (2009).

The following facts are relevant to our review of the defendant's second claim. The court provided defense counsel and the assistant state's attorney with a copy of the charge it intended to use to instruct the jury.[18]

---

[18] The defendant requested that the court charge the jury as follows: "Criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state. The purpose of the rule of strict construction is to enable the people of the [s]tate to know clearly and precisely what acts the legislature has forbidden under a penalty, that they may govern their conduct accordingly, and to make sure that no act which the legislature did not intend to include will be held by the courts within the penalty of the law. Ambiguities in criminal statutes are ordinarily to be resolved in favor of the defendant." (Internal quotation marks omitted.)

The defendant wanted the court to instruct the jury to consider kidnapping in the second degree and unlawful restraint in the first degree simultaneously, rather than sequentially, as the court instructed the jury. The court denied the defendant's request to charge on the ground that it concerns

The court held both off-the-record and on-the-record reviews of its proposed charge. The following colloquy took place during the on-the-record review.

"[The Prosecutor]: . . . One of the things that we did discuss in chambers, and I did want to put on the record, was, in light of *Salamon*, there was not going to be a request that any restraint was incidental to a different crime. I recognize the state of the law with respect to *Salamon* and the other cases, but it's my understanding that there is going to be no request by defense relative to that type of charge or . . . that language that's contained therein. I just want to make sure that the record is . . . clear relative to that.

"The Court: And that is not included in the draft of the charge which has been provided, and that . . . the prosecutor's statement is correct then, [defense counsel]?

"[Defense Counsel]: Yes.

"The Court: All right."[19]

The defendant objects to the following portion of the court's charge, claiming that it confused the jury.[20] "You

principles of statutory construction, which are questions of law and are not within the province of the jury.

[19] Defense counsel had objected to the court's proposed charge on kidnapping in the second degree and unlawful restraint in the first degree on the grounds that "there's no difference between the two, and I think it's vague, unconstitutionally vague, the difference between the two as applied in this case."

[20] The court charged the jury with respect to kidnapping in the second degree as follows. "The first count of the information accuses the defendant . . . of kidnapping in the second degree in violation of Connecticut General Statutes § 53a-94, and charges that at the towns of Stonington and Ledyard, on or about the second of May, 2002, the said [defendant] did abduct another person, to wit, [the alleged victim] in violation of § 53a-94 of the Connecticut General Statutes.

"The statute defining this offense reads in pertinent part as follows: A person is guilty of kidnapping in the second degree when he abducts another person. For you to find the defendant guilty of this charge the state must prove beyond a reasonable doubt that the defendant abducted [the alleged victim]. Abduct means to restrain a person with the intent to prevent her

may recall that one or more witnesses used certain

liberation by using or threatening to use physical force or intimidation. The defendant does not need to actually use force, he need only threaten to use force in such a manner that [the alleged victim] reasonably believed that force would be used if she tried to escape.

"Restrain means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with her liberty by moving her from one place to another, or by confining her either in the place where the restriction commences, or in a place to which she has been moved without consent. There is no requirement that the movement be of any specific distance, or that the confinement last any specific period of time. There need not be any movement at all. The person could be confined by preventing her from leaving a place where she was.

"Any apparent consent on the part of [the alleged victim] to the movement or confinement must have been actual and not simply acquiescence brought about by force, fear, shock, or deception. The act of consent must have been truly voluntary. Consent may be expressed, or you may find that it is implied from the circumstances that you find existed. Whether there was consent is a question of fact for you to determine. The defendant has no burden to prove consent. The state must prove the lack of consent.

"In abducting [the alleged victim], the defendant must have specifically intended to prevent her liberation. Intent relates to the condition of mind of the person who commits the action, his purpose in doing it. As defined by our statute, a person acts intentionally with respect to a result when his conscious objective is to cause such result.

"What a person's intention was is usually a matter to be determined by inference. No person is able to testify that he or she looked into another's mind and saw therein a certain knowledge or a certain purpose or intention to do harm to another. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was at any given time is by determining what the person's conduct was, and what the circumstances were surrounding that conduct, and from that infer what his intention was.

"To draw such an inference is the proper function of a jury, provided, of course, that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. The inference is not necessary. You are not required to infer a particular intent from the defendant's conduct or statements, but it is an inference that you may draw if you find it reasonable and logical. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state.

"Unlawfully means without legal right or justification. Thus, either the alleged victim must have been moved from one place to another, or the alleged victim must have been confined to the place where the restriction first began, or in the place to which she has been moved without her consent. There is no special requirement that the restraint be for any particular length

terms in their testimony, such as the word kidnapping, which have legal definitions. I will give you those definitions in these instructions, and those definitions should control your deliberations. . . . A person is guilty of kidnapping in the second degree when he abducts another person. For you to find the defendant guilty of

of time, or, again, that the alleged victim be moved over any particular distance.

"The law which makes kidnapping criminal punishes interference with personal liberty in restricting the victim's freedom of movement, so you cannot find kidnapping unless you first find and establish that there was such restriction of movement, and that it has been done intentionally, that it has been done without right or authority of law, and that it has had the effect of interfering substantially with the victim's liberty.

"Abduction may be established by sufficient proof that the alleged victim has been unlawfully restrained, and that with intent to prevent her liberation the defendant restrained her by using or threatening to use physical force or intimidation. Abduction need not be proven by establishing the use of force or intimidation if the proof establishes that the defendant threatened its use in such manner that the alleged victim reasonably believed that force would be applied to her if she sought to escape, or to thwart the abductor's intention.

"Physical force means the external physical power over the person which can be effected by hand or foot or another part of the defendant's body applied to the other person's body, or applied by an implement, projectile or weapon. Physical force may take many forms. It is for you to decide whether the evidence proves that physical force was used by the defendant, and whether it actually produced and resulted in the accomplishment of the restraint which is charged. The use of physical force need not be proved if the evidence proves that the restraint was accomplished by intimidating. This requires that the defendant's words or acts placed the victim in a state of fear. Such intimidating may be found in a threat to inflict the injury made by one with the apparent power to carry out those threats. To constitute intimidating and thus remove the need to prove actual lack of consent, the proof must convince you that the words or acts of the defendant under the circumstances appearing at the time and place in question enabled the defendant to carry out and effect the restraint or removal by placing the alleged victim in terror.

"In summary, the state must prove beyond a reasonable doubt that the defendant abducted [the alleged victim]. If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of kidnapping in the second degree, then you shall find the defendant guilty. On the other hand, if you unanimously find that the state failed to prove beyond a reasonable doubt any of the elements of kidnapping in the second degree, you shall . . . then find the defendant not guilty."

this charge the state must prove beyond a reasonable doubt that the defendant abducted [the alleged victim]. Abduct means to restrain a person with the intent to prevent her liberation by using or threatening to use physical force or intimidation. . . . Restrain means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with her liberty by moving her from one place to another, or by confining her either in the place where the restriction commences, or in a place to which she has been moved without consent. There is no requirement that the movement be any specific distance, or that the confinement last any specific period of time. There need not be any movement at all. . . .

"For you to find the defendant guilty of [unlawful restraint] the state must prove the following elements beyond a reasonable doubt. One, that the defendant specifically intended to restrain [the alleged victim] and did so by moving her from one place to another, or by confining her in some place in such a manner as to interfere substantially with her liberty. . . . There is no requirement that the movement be any specific distance, or that the confinement last any specific period of time."[21]

"The term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . This court has found induced error undeserving of appellate review in the context of a jury instruction claim when the defense has affirmatively requested the challenged jury instruction . . . or has encouraged or prompted the court to refrain from giving

---

[21] At the conclusion of its charge, the court asked counsel whether they had "any additional exceptions or objections to the charge as delivered." Defense counsel stated, "No, Your Honor."

an instruction that arguably should have been given." (Citations omitted; internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 468–69. "[T]o allow [a] defendant to seek reversal [after] . . . his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Gibson*, 270 Conn. 55, 67, 850 A.2d 1040 (2004).

Our Supreme Court acknowledged in *State* v. *Salamon*, supra, 287 Conn. 534, that there is ambiguity between the definitions of abduct and restrain. *Salamon*, however, concluded that different intent requirements pertain to kidnapping in the second degree and unlawful restraint in the first degree. To assist a jury in its deliberations, *Salamon* identified six factors for the jury to consider when determining whether particular conduct constitutes the crime of kidnapping in the second degree. Id., 547–48. The record in this case reflects that the defendant specifically objected to the inclusion of the *Salamon* factors and the language as to whether the defendant intended "to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. The inclusion of those instructions in the court's jury charge would have resolved the ambiguity of which the defendant now complains. His strategy at trial having failed, he cannot reverse his conviction on appeal on the ground of an improper jury instruction.

Moreover, even if the court's limited charge were incorrect, an issue we do not address, any error was harmless beyond a reasonable doubt. See *State* v. *Hampton*, supra, 293 Conn. 463 (test determining whether constitutional impropriety is harmless is whether it appears beyond reasonable doubt that impropriety complained of did not contribute to verdict

obtained). In this case, there was overwhelming evidence by the defendant's own testimony that he assaulted the victim in her garage with a stun gun, bound her hands, placed her in the Buick, drove the back roads of New London County and took her to his residence before resuming his circuitous drive. The defendant abducted the victim by restraining her with the intent to prevent her liberty by the use of physical force. See General Statutes § 53a-91 (2). A jury reasonably could have found beyond a reasonable doubt that the defendant intended to prevent the victim's liberation for a longer time and to a greater degree than was necessary to commit assault in the third degree. See *State* v. *Salamon*, supra, 287 Conn. 542; see also part I of this opinion. For the foregoing reasons, the defendant's jury instruction claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.