# STATE OF CONNECTICUT *v.* ANGEL LUIS SANCHEZ
## (AC 31735)

Beach, Robinson and Borden, Js.

 

Argued September 15, 2010—officially released April 19, 2011

*Katherine C. Essington*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Angel Luis Sanchez, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B),[1] attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (3) and 53a-49, and assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claims that the court erred in (1) denying his motion to suppress evidence of his pretrial identification by the victim, (2) failing to instruct the jury, sua sponte, concerning the risk of misidentification in accordance with *State* v. *Ledbetter*, 275 Conn. 534, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), and (3) denying his motion for a judgment of acquittal with respect to attempted robbery and kidnapping because of insufficient evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 18, 2003, Nancy Tong was working alone at Will Mart, a convenience store in Manchester. At approximately 11 a.m., a man who was later identified as the defendant entered the store. The defendant

---

[1] During the sentencing proceeding, the court merged the conviction on the two kidnapping charges.

removed some merchandise from the shelves, including paper towels, boxes of trash bags, cleaning products, duct tape and a pail, and placed the merchandise on the store counter. Although Tong placed the merchandise into bags, the defendant did not pay for the merchandise. The defendant instead left the store, stood for a while outside and then came back inside the store. After the defendant repeated this behavior a couple of times, Tong asked the defendant if he planned to pay for the items. The defendant responded that he worked for CJ Landscaping and was waiting for his boss to arrive and pay for the merchandise. Tong responded, "okay," because she was familiar with the landscaping company and the owners of the company, who lived behind the Will Mart store. Tong was also familiar with the defendant because she had seen him three times inside the Will Mart store over the past few weeks.

Tong observed the defendant repeatedly exit the store, stand alone outside and reenter the store. At approximately 1 p.m., while Tong was positioned near the cash register and the bagged merchandise for which the defendant had not yet paid, he approached Tong and told her that he was armed with a gun and that he wanted her to go to the back of the store. As the defendant grabbed Tong and pushed her toward the back of the store, Tong told him that if he wanted money, she would give money to him. The defendant told Tong that he wanted to tie her up. While in the back of the store, the defendant began to stab Tong with a knife. Tong fought back, attempting to grab the knife. Two customers then entered the store and began screaming and asking what was happening. The defendant dropped the knife and fled.

Tong sought assistance at a nearby restaurant and was thereafter taken to a nearby hospital where she underwent surgery. Paul Lombardo and James Graham, detectives with the Manchester police department,

arrived at the hospital at approximately 9:30 p.m. and interviewed Tong. Tong provided the detectives with a written statement, which included a physical description of the perpetrator. The state forensic laboratory found a single latent fingerprint on a roll of duct tape that the defendant had placed on the store counter. A photograph of the fingerprint was entered into a computer program, known as the automated fingerprint identification system, which is a national database that matches latent fingerprints found at crime scenes with fingerprint samples taken from individuals when they are arrested and supplies a list of "candidates" whose fingerprints are a possible match. The database system did not yield, at that time, any possible matches to the fingerprint found on the duct tape. In November, 2003, the police suspended the investigation.

In July, 2004, Lombardo revived the investigation. During that month, Tong worked with Lombardo to develop a sketch of the perpetrator. Lombardo concluded that Tong had "very good recall of what her assailant looked like." In October, 2004, the state forensic laboratories contacted Lombardo and informed him that the computer database revealed possible matches to the fingerprint found on the duct tape. Michael J. Supple, a fingerprint examiner, matched the fingerprint to the defendant's based on seven shared points of identification. Supple testified at trial that there were additional shared points of identification, but seven is all that is needed for an identification.

In November, 2004, Tong went to the Manchester police station, and Lombardo showed her a photographic array that he had compiled. The photographic array consisted of the most recent photograph that Lombardo had of the defendant as well as photographs of seven other individuals. All eight photographs depicted individuals with facial hair. Lombardo noticed that Tong was having difficulty and asked her if she was "having

a problem" because the perpetrator was clean shaven and the individuals in the photographic array all had facial hair. Tong responded affirmatively and did not make an identification from the first array. Subsequently, Lombardo spent fifteen to twenty minutes compiling a second photographic array. In compiling the second photographic array, Lombardo gathered together photographs of individuals with facial features similar to those of the defendant. The second photographic array consisted of eight individuals, including one photograph of the defendant. All individuals in this photographic array appeared relatively clean shaven. The defendant was the only individual whose photograph was included in both photographic arrays. The photograph of the defendant that was used in the second photographic array was different from the photograph of him that was used in the first photographic array. Tong selected the defendant's photograph from the second array then signed and dated the photograph.

Following a jury trial, the defendant was convicted of kidnapping in the first degree, attempted first degree robbery and assault in the first degree. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erred in denying his motion to suppress evidence of Tong's pretrial identification of him because it violated his right to due process under the state and federal constitutions.[2] We disagree.

In August, 2008, prior to the start of trial, the defendant filed a motion to suppress "any pretrial or in court identification of the defendant which the [s]tate intends to use at . . . trial." During trial, but outside the jury's

---

[2] Our Supreme Court has held that article first, § 8, of the state constitution provides no greater protection than the federal constitution with respect to identification procedures. See State v. Ledbetter, supra, 275 Conn. 568.

presence, the court held an evidentiary hearing on the motion. In denying the motion to suppress, the court determined that "the procedure may be suggestive in that [in] the second array some of the people do look younger" than the defendant. The court, however, determined that the identification was reliable because at the time of the incident Tong had the opportunity over the course of several hours to see the defendant during midday when there was plenty of light and was able to converse with him.

We set forth our standard of review. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . . Furthermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of fact-bound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error."

(Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 547–48.

"[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). . . . [W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime, the [witness'] degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Citations omitted; internal quotation marks omitted.) *State* v. *Nieves*, 106 Conn. App. 40, 46–47, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008).

The defendant agrees with the court's determination that the procedure used was suggestive but argues that the court erred in determining that the out-of-court identification was nevertheless reliable. The state argues that the court properly concluded that the identification was reliable, and, as an alternate ground for affirmance, argues that, to the extent that the court ruled that the identification procedure was unnecessarily suggestive,[3] such a ruling was improper. We do not reach the state's alternate ground for affirmance because we conclude that the court properly concluded that the identification was reliable for the purpose of admissibility.

---

[3] The state contends that the court characterized the procedure as "suggestive," and the defendant failed to seek an articulation from the court as to whether it found the procedure to be unnecessarily suggestive.

The defendant contends that the identification was not reliable because: sixteen months had passed between the commission of the crimes and Tong's identification of the defendant as the perpetrator; Tong's initial description of the perpetrator as a young black male possibly with a tattoo on his arm is inconsistent with the defendant's physical characteristics of being forty-two years old, having no tattoo on his arm and, at least as the defendant attempts to describe himself, Hispanic; Lombardo failed to caution Tong that the perpetrator's photograph may not be in the array; and Tong observed the perpetrator on the day in question for less than one-half hour.

On the day in question, Tong had an opportunity to view the defendant during midday over the course of several hours.[4] Tong had ample opportunity to view him when she conversed with the defendant about payment, when he approached her with a gun and when he assaulted her in the back room of the store. Further, Tong's testimony indicates that she was paying a high degree of attention to the defendant during the commission of the crime. She testified that she remembered

[4] The defendant also claims that the court's finding that Tong had the opportunity to view him over the course of several hours was clearly erroneous. He bases this argument on Tong's testimony that he first came into the store approximately one-half hour before the incident and that he left the store several times during the encounter. The defendant argues that, as a result, Tong's face-to-face time with the perpetrator on the day in question was likely less than one-half hour. The court's finding is supported by Lombardo's testimony that Tong had informed him that the perpetrator arrived at the store at 11 a.m. and exited and reentered the store until 1 p.m. "As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 284, 889 A.2d 821 (2006). Therefore, we reject the defendant's argument.

seeing the defendant in the store on three prior occasions and that she "could not forget [the defendant's] face." "A victim of a crime is apt to be a more reliable source of identification than is a mere spectator to the incident."[5] (Internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 109, 591 A.2d 1246 (1991).

Tong's description to the police of the perpetrator was fairly accurate. Tong's initial description of the perpetrator was that of a young, thin black male possibly with a tattoo on his arm. The fact that the defendant was forty-two years old at the time of the incident was not necessarily inconsistent with Tong's description of the perpetrator as appearing young. The defendant's relatively youthful appearance is evident in the photographic array. Tong also described the perpetrator as *possibly* having a tattoo on his arm.[6] During trial, the defendant displayed his arms to the jury, thereby apparently revealing the lack of a tattoo. During closing argument, the state noted that while the defendant did not have a tattoo on his arms, he did have marks, which could have appeared to Tong to be a tattoo.

Additionally, the defendant's argument regarding the phraseology initially used by Tong in an attempt to describe the defendant's complexion is unavailing because it does not necessarily undermine the reliability

---

[5] We note that the validity of the certainty factor has been questioned by commentators. See *State* v. *Marquez*, 291 Conn. 122, 155–56, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009); *State* v. *Ledbetter*, supra, 275 Conn. 566–69. In light of Tong's extended opportunity to view the perpetrator, including a significant amount of time under nonstressful circumstances, we believe that the level of certainty has some relevance at least in the circumstances presented. In this context, there also was testimony that Tong recognized the defendant as a prior customer.

[6] The defendant argues in this court that he did not have a tattoo on his arm. The defendant did not testify at trial but showed his arms to the jury in a nontestimonial display. The record does not specifically state whether there was any tattoo. In closing argument, the state argued that while there did not appear to be a tattoo, marks of some nature were present. Defense counsel argued that there was no tattoo.

of the identification. The phrase "black male" can apply to a wide variety of people and is not necessarily inconsistent with "Hispanic," which describes only language or culture.

The approximately sixteen month period between the commission of the crimes and Tong's identification of the defendant was not so long, under the circumstances of this case, as to render the identification unreliable. See *State* v. *McClendon*, 45 Conn. App. 658, 666, 697 A.2d 1143 (1997) (two year period between commission of crime and identification did not render identification unreliable where victim had ample opportunity to see defendant, had high degree of attention during encounter and provided detailed description at time of incident), aff'd, 248 Conn. 572, 730 A.2d 1107 (1999); *State* v. *Copeland*, 22 Conn. App. 98, 107, 576 A.2d 567 (1990) (fifteen months between incident and identification not enough under totality of circumstances to render identification unreliable). Approximately one year after the incident, Tong provided a detailed description of the perpetrator to a police detective who compiled a sketch. The facial features depicted in the sketch are reasonably similar to those of the defendant.

Taking all of these factors into account, and weighing them against the effect of the photographic identification procedure, which we assume, arguendo, was suggestive,[7] we conclude that Tong's identification testimony was reliable for the purpose of admissibility. Accordingly, we conclude that the court did not abuse its discretion in denying the defendant's motion to suppress Tong's identification of the defendant.

## II

The defendant next claims that the court erred in failing to instruct the jury, sua sponte, concerning the

---

[7] As a factor weighing against reliability, the defendant highlights the suggestiveness of the procedure, namely, the detective's failure to inform Tong that there may not have been a photograph of the suspect in the array.

risk of misidentification in accordance with *State* v. *Ledbetter*, supra, 275 Conn. 534. The defendant seeks to prevail on his unpreserved claim, which is not of constitutional dimension; see id., 577; under the plain error doctrine. See Practice Book § 60-5. We are not persuaded.

The plain error doctrine "is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . .

"[W]e recently clarified the two step framework under which [an appellate court] review[s] claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of

the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204–205, 982 A.2d 620 (2009).

In *Ledbetter*, our Supreme Court in exercise of its supervisory powers[8] held that "unless there is no significant risk of misidentification, we direct the trial courts of this state to incorporate an instruction in the charge to the jury, warning the jury of the risk of misidentification, in those cases where: (1) the state has offered eyewitness identification evidence; (2) that evidence resulted from an identification procedure; and (3) the administrator of that procedure failed to instruct the witness that the perpetrator may or may not be present in the procedure."[9] *State* v. *Ledbetter*, supra, 275 Conn.

[8] The court noted that "[w]e ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." *State* v. *Ledbetter*, supra, 275 Conn. 578.

[9] The court adopted the following instruction: "In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the crime charged. That identification was the result of an identification procedure in which the individual conducting the procedure either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator's photograph may or may not be in the procedure.

"Indicating to a witness that a suspect is present in an identification procedure or failing to warn the witness that the perpetrator may or may not be in the procedure may increase the likelihood that the witness will select one of the individuals in the procedure even when the perpetrator is not present. Thus, such action on the part of the procedure administrator may increase the probability of a misidentification.

"This information is not intended to direct you to give more or less weight to the eyewitness identification evidence offered by the state. It is your duty to determine what weight to give to that evidence. You may, however, take

579. Regarding the risk of misidentification, although the court "decline[d] to delineate all of the potential factual variations that might result in the trial court finding no significant risk of misidentification, [it] note[d] that one example would be where the defendant was known by the witness before the incident occurred." Id., 579 n.26. The court noted that "[t]he trial court should make its determination of whether a significant risk of misidentification exists on the basis of the totality of the circumstances." Id.

The defendant argues that the court should have given a *Ledbetter* instruction sua sponte because there was identification evidence offered by the state during trial, the identification evidence resulted from an identification procedure, the detective who administered the identification procedure did not warn Tong that the perpetrator may not be depicted in the photographic array and there was a significant risk of misidentification.

Assuming, without deciding, that the trial court was required to give a *Ledbetter* instruction,[10] we conclude that the failure of the court in this case sua sponte to give the instruction does not present the type of extraordinary situation that warrants reversal under the plain error doctrine. Even if we were to assume that it was error not to give a *Ledbetter* instruction, and that the error is not debatable, we cannot say that the trial was "fundamentally unfair or manifestly unjust." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, supra, 294 Conn. 205. Tong had

into account this information, as just explained to you, in making that determination." *State* v. *Ledbetter*, supra, 275 Conn. 579–80.

[10] It is uncontested that the state offered eyewitness identification evidence that resulted from an identification procedure at which the detective failed to instruct Tong that the perpetrator may or may not be present. The parties contest whether there was a significant risk of misidentification. We make no determination whether a significant risk of misidentification existed in the present case.

an opportunity to view the defendant prior to the commission of the crimes, and there was testimony that Tong recognized him as a prior customer. Tong's identification was corroborated by a fingerprint found on a roll of duct tape that the perpetrator had placed on the store counter that matched the defendant's fingerprint. Supple matched the fingerprint with a fingerprint known to be the defendant's based on seven shared points of identification. Furthermore, when Lombardo, while interviewing the defendant, confronted him with the fingerprint evidence and asked if he remembered not wearing gloves on the day in question, the defendant became visibility upset and ran out of the interview room. Thus, a jury could have found consciousness of guilt. See, e.g., *State* v. *Reid*, 193 Conn. 646, 655, 480 A.2d 463 (1984). There also was evidence that the perpetrator told Tong that his boss at CJ Landscaping was coming to pay for the goods and that the defendant previously had worked for CJ Landscaping. The failure to give the *Ledbetter* instruction did not result in manifest injustice.

### III

The defendant next claims that the court erred in denying his motion for a judgment of acquittal with respect to his conviction of attempted first degree robbery in violation of §§ 53a-134 (a) (3) and 53a-49, and first degree kidnapping in violation of § 53a-92 (a) (2) (B)[11] based on insufficient evidence. We disagree.

We first set forth our standard of review. "The standard of review [that] we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal

[11] The defendant also was charged, and found guilty of, kidnapping in the first degree in violation of § 53a-92 (a) (2) (A). The conviction on the two kidnapping charges was merged in the sentencing proceeding. The defendant does not challenge the sufficiency of the evidence as to his conviction under § 53a-92 (a) (2) (A).

conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008).

"[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Francis*, 90 Conn. App. 676, 681, 879 A.2d 457, cert. denied, 275 Conn. 925, 883 A.2d 1248 (2005).

In count two of the information, the defendant was charged with kidnapping in the first degree. According to § 53a-92 (a), "[a] person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ." General Statutes § 53a-92 (a). The trial court instructed the jury that the underlying felony alleged by the prosecution in this case was robbery and that the parties had stipulated that robbery in the first degree is a felony.

In count three of the information, the defendant was charged with attempted robbery in the first degree. A

person is guilty of first degree robbery under § 53a-134 (a) (3) "when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . uses or threatens the use of a dangerous instrument . . . ." General Statutes § 53a-134 (a) (3). Pursuant to General Statutes § 53a-133, "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property . . . or (2) compelling the owner of such property . . . to deliver up the property or to engage in other conduct which aids in the commission of the larceny." "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." General Statutes § 53a-119.

Section 53a-49 (a), which defines criminal attempt, provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Section 53a-49 (b) provides in relevant part that "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ."

The defendant's claim concerns the element of intent. He argues that the state failed to prove beyond a reasonable doubt that he had the intent to commit a larceny at the Will Mart, a necessary element of attempted robbery and of the kidnapping count that required robbery

as an element. The defendant maintains that the following actions are inconsistent with an intent to commit a robbery or larceny: staying at Will Mart before approaching Tong and informing her that he had a gun; not attempting to disguise his identity while speaking to Tong; never demanding money from Tong or attempting to remove any items from the store; not accepting Tong's offer to give him money but instead responding that he wanted to tie her up; taking Tong to the back of the store away from the area that contained cash and merchandise, while in the back room choking and stabbing Tong as opposed to taking anything; and then fleeing the store empty handed. The defendant also argues that the state did not adduce sufficient evidence to establish that he took a substantial step toward the commission of a larceny. He contends that none of his actions were strongly corroborative of an intent to commit a larceny at Will Mart but rather were perhaps corroborative of an intent to assault Tong.

Our function on appeal is not to ask whether there is a reasonable view of the evidence that would support the defendant's innocence of the crimes charged, but rather we are to ask whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. See *State* v. *Butler*, 296 Conn. 62, 76–77, 993 A.2d 970 (2010). When reviewing sufficiency claims, we are to construe the evidence in the light most favorable to sustaining the verdict. See *State* v. *Cook*, supra, 287 Conn. 254.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the state adduced sufficient evidence on which the jury could have found that the defendant had a larcenous intent[12]

[12] "The mental state required to commit robbery in the first degree is the intent to commit larceny, which requires the specific intent to deprive or to misappropriate." *State* v. *Pascal*, 109 Conn. App. 55, 62, 950 A.2d 566, cert. denied, 289 Conn. 917, 957 A.2d 880 (2008). In this case, one count of

and that his actions can be construed to corroborate an intent to commit a larceny. The evidence reveals the following. Upon arriving at the store, the defendant took several items of merchandise and placed them on the counter. Tong placed them in a bag. The defendant did not pay for the items and instead walked in and out of the store several times. After Tong questioned him regarding payment, the defendant still did not pay for the items but continued to walk in and out of the store. When Tong was near the cash register, which was located near the bags of merchandise on the counter, the defendant approached her with a gun. The jury could have inferred a larcenous intent from the defendant's actions in placing store merchandise on the counter, continually walking in and out of the store, his promise to pay Tong when she questioned him, his subsequent failure to pay and his subsequent threat to use force against Tong while she was near the cash register and the merchandise for which he had not paid. The jury may reasonably have inferred that the defendant intended to use the items to secure Tong and to clean up the evidence, but the customers interrupted the intended crime.

Contrary to the defendant's argument that his actions are inconsistent with a larcenous intent, his fleeing the store without the merchandise or the money only when interrupted by customers is not inconsistent with a larcenous intent. In support of his argument that he did not possess a larcenous intent, the defendant highlights the fact that when he approached Tong with a gun, he did not expressly demand the merchandise or respond to Tong's offer to give him money; instead, he attempted to tie up Tong. The jury reasonably could have found, among other scenarios, that the defendant did not intend to pay for the merchandise and decided to tie

kidnapping required the same intent element because the state specified robbery as the underlying felony for one count of kidnapping.

Tong up in an effort to commit a robbery as well as an assault. Although the inference of intent was not necessarily compelled by the evidence, the evidence was reasonably susceptible of the inference, and the inference was not so unreasonable as to be unjustifiable. See *State* v. *Copas*, 252 Conn. 318, 340, 746 A.2d 761 (2000).

The judgment is affirmed.

In this opinion the other judges concurred.