******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NOEL CHANCE
(AC 34393)

Gruendel, Lavine and Beach, Js.

*Argued September 12, 2013—officially released January 21, 2014*

(Appeal from Superior Court, judicial district of
Litchfield, Marano, J.)

*Glenn W. Falk*, assigned counsel, for the appellant
(defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with
whom, on the brief, was *David Shepack*, state's attor-
ney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Noel Chance, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the second degree in violation of General Statutes § 53a-94, and attempt to commit kidnapping in the second degree in violation of General Statutes §§ 53a-49 and 53a-94.[1] On appeal, the defendant claims that: (1) there was insufficient evidence for him to be convicted of kidnapping in the second degree and attempted kidnapping in the second degree; (2) any distinction between kidnapping in the second degree, § 53a-94 (a), and unlawful restraint in the first degree, General Statutes § 53a-95 (a), is unconstitutionally vague as applied to him in this case; (3) his conviction and sentences for both kidnapping and attempted kidnapping, which were based on the same incident, violate his right against double jeopardy; and (4) the trial court abused its discretion in ordering him to register as a sex offender upon release from imprisonment. We affirm in part and reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. From the spring of 2006 through the summer of 2007, the defendant regularly drove around rural areas of Litchfield County in his pickup truck with his black Labrador retrievers and followed female joggers. Four women testified about events that occurred prior to the incident involving the victim in this case. They identified the defendant's silver pickup truck, which sported an oval black Labrador retriever silhouette sticker on the rear window, as the truck that followed them. These women testified at trial that the defendant repeatedly drove past them without acknowledging them, as if he was watching them, as many as ten to twelve times during any one individual run.

One of the women, for example, a forty-three year old schoolteacher, reported the defendant's behavior to a state police trooper who worked in her school. The trooper advised her to note the license plate number of the defendant's vehicle. Later, when getting into her car after a jog, she saw the defendant's truck and was able to get close enough to make out, and to record, the license plate number. After recording the license plate number, she continued driving. At the next stop sign, she looked up and saw that the defendant's truck had circled around her and appeared behind her in her rearview mirror. "[F]rightened," she drove to the Litchfield courthouse. Shortly thereafter, she stopped running in the area and provided the state trooper who worked at her school with the defendant's license plate number.[2] After receiving complaints, police officers talked to the defendant on three separate occasions and warned him that his conduct was alarming female joggers. On March 30, 2007, after receiving one witness' complaint and determining that the license plate number the witness provided was registered to the defen-

dant, Troopers Jason Uliano and Cono D'Elia contacted the defendant. When the troopers informed the defendant that his actions were alarming female joggers, the defendant indicated that he understood and said that "he would drive somewhere else, he wouldn't do that anymore." The defendant later provided a written statement to Trooper Samantha McCord in which he explained that he occasionally drove around Litchfield with his dogs and may have driven on the same roads repeatedly while drinking his coffee, but that he did not intend to offend anyone.

On April 27, 2007, McCord again visited the defendant and confronted him with information she uncovered that was inconsistent with information he had previously provided about his employment status. When confronted, the defendant acknowledged that he was out of work and stated that he had left some things out of his initial statement. The defendant then admitted that he was driving in the area described by the witness in her complaint—stating that he had observed a "pretty" brunette and that "he had been driving past to check out the pretty brunette." McCord warned the defendant that his conduct was alarming female joggers in the area and that he should cease driving in the area. The defendant appeared to understand McCord's warning.

On August 11, 2007, the five foot tall, ninety pound, fourteen year old victim in this case was jogging on a secluded road in Litchfield.[3] The defendant, who was driving in his truck with his dog, started following the victim. The defendant slowed down and asked her if she wanted a ride. When she refused, the defendant stopped his truck on the side of the road, exited his truck, and chased her. The defendant grabbed her by her ponytail causing her to fall face down on the side of the road. The defendant then engaged in a struggle with the victim that, according to testimony, lasted approximately five minutes. The defendant wrapped his arms around her, touching her breasts, and tried to pick her up. The victim fought back and screamed. The defendant covered her mouth to suppress her screams, told her to shut up, and attempted to pick her up. The victim began "heaving," unable to catch her breath. The defendant released the victim, backed away, and asked her if she was okay. The victim responded, "just leave," and, "please leave." When the defendant turned and walked toward his truck, the victim ran into a wooded area and hid. The victim attempted to call her mother from her cell phone, but was unable to reach her. She then called 911. State troopers arrived at the scene and aided the victim.

The state charged the defendant in a six count information as follows: in count one, kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A); in count two, kidnapping in the second degree in

violation of § 53a-94; in count three, attempted kidnapping in the second degree in violation of §§ 53a-94 and 53a-49 (a) (2); in count four, unlawful restraint in the first degree in violation of § 53a-95; and in counts five and six, risk of injury to a child in violation of § 53-21 (a) (1) and (2), respectively. The jury found the defendant guilty of kidnapping in the second degree, attempted kidnapping in the second degree, unlawful restraint in the first degree, and risk of injury to a child in violation of § 53-21 (a) (1). The trial court merged the defendant's conviction on count three, attempted kidnapping in the second degree, with his conviction on count two, kidnapping in the second degree. On October 17, 2008, the court imposed a total effective sentence of twenty years of incarceration, execution suspended after eight and one-half years, followed by five years of probation with special conditions. The court additionally ordered the defendant to register as a sex offender for a period of ten years following his release. The defendant unsuccessfully moved for a new trial. After restoration of the defendant's appellate rights through a habeas corpus proceeding, this appeal followed.[4] Additional facts will be set forth as necessary.

I

The defendant first claims that the state failed to introduce sufficient evidence to prove kidnapping in the second degree and attempted kidnapping in the second degree beyond a reasonable doubt.[5] Specifically, the defendant claims that the state failed to prove beyond a reasonable doubt that he restrained or attempted to restrain the victim with the intent to prevent her liberation. The defendant argues that on the basis of *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), insufficient evidence existed from which the jury reasonably could conclude that he intended to prevent the victim's liberation for a longer period of time or to a greater degree than was necessary to commit the uncharged crime of assault. We disagree.

We first set forth our standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense[s], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . [I]n determining whether the

evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . [A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Internal quotation marks omitted.) *State* v. *Ayala*, 133 Conn. App. 514, 519, 36 A.3d 274, cert. denied, 304 Conn. 913, 40 A.3d 318 (2012).

"[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Sanchez*, 128 Conn. App. 1, 16, 15 A.3d 1182 (2011), aff'd, 308 Conn. 64, 60 A.3d 271 (2013). "[I]ntent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances. . . . An accused's own words . . . constitute particularly compelling, direct evidence of his intent." (Citations omitted.) *State* v. *Winot*, 294 Conn. 753, 768, 988 A.2d 188 (2010).

In count two of the information, the defendant was charged with kidnapping in the second degree. Pursuant to § 53a-94 (a), "[a] person is guilty of kidnapping in the second degree when he abducts another person." "Abduct" means "to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). In *State* v. *Salamon*, supra, 287 Conn. 509, our Supreme Court elaborated on the requirements for establishing kidnapping: "in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime." (Footnote omitted.) Id., 546. The relevant inquiry as to count two, therefore, is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation.[6]

In count three of the information, the defendant was charged with attempted kidnapping in the second degree. Section 53a-49 (a), which defines criminal attempt, provides in relevant part: "[a] person is guilty

of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (1) [i]ntentionally engages in conduct which could constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Section 53a-49 (b) provides in relevant part that "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ."

The defendant's claim concerns the element of intent. He argues that the state failed to prove beyond a reasonable doubt that he had the intent to abduct the victim, a necessary element of both attempted kidnapping and kidnapping. The defendant maintains that the following considerations are inconsistent with an intent to commit kidnapping: "[the defendant] stepped back and asked [the victim] if she was okay," "[t]he defendant did not possess or use any gun, knife, rope, or tape to bind the victim or force her to go somewhere against her will," "[the defendant] did not pull her toward the truck or carry her off by lifting her onto his shoulder," "the defendant did not fondle the victim, force her to the ground, spread her legs, or unclothe her," "[t]he defendant himself was not unclothed or visibly sexually aroused," and "the defendant did not attempt to move her toward the truck or into cover." We disagree.

"Our function on appeal is not to ask whether there is a reasonable view of the evidence that would support the defendant's innocence of the crimes charged, but rather we are to ask whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." *State* v. *Sanchez*, supra, 128 Conn. App. 18. When reviewing sufficiency claims, we construe the evidence in the light most favorable to sustaining the verdict. Id. "We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Nicholson*, 71 Conn. App. 585, 590, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the state introduced sufficient evidence from which the jury reasonably could have found that the defendant had the intent

to prevent the victim's liberation and that the defendant's actions can be construed to corroborate an intent to prevent the victim's liberation, i.e., commit a kidnapping. The evidence reveals the following: On August 11, 2007, the five foot tall, ninety pound, fourteen year old victim was jogging in Litchfield. Following her usual jogging route, the victim turned off a main road and turned onto a dirt road. As she jogged down the dirt road, the defendant passed her in his truck three or four times. Feeling "uneasy," the victim altered her route by turning off the dirt road and running a loop through a residential neighborhood. About twenty minutes later, the victim returned to the dirt road. As she jogged down the dirt road toward the main road, the victim jogged past the defendant in his pickup truck, which was stopped at a stop sign. The victim continued jogging and the defendant passed her in his truck. The defendant then drove up *behind* her, rolled down his window, and asked her if she "wanted to have a ride" or to "get in the car." The victim declined. The defendant again told the victim, "you can get in the car." The victim politely declined a second time and kept jogging.

The defendant then stopped his truck and left it idling. He got out and approached the victim. The victim "sprinted toward the other side of the road" and "started screaming." The defendant ran after the victim and grabbed her by her ponytail, causing her to trip and fall face down on the side of the road. The defendant then put both of his arms around the victim—one arm touching her stomach and the other arm touching her breasts—and tried to pick her up. The victim screamed and fought back. The defendant picked her up, but she was able to free herself and to throw herself back onto the ground. The defendant tried several times to pick up the victim but she continued to fight back and to scream.

The defendant then "covered [the victim's] mouth with his hand" and "pushed it down hard" and told her to "shut up." The victim "tried to bite him" and "tried to scream louder" but began "choking on [her] breath." The victim started "heaving"—unable to catch her breath and "choking every time [she] tried to breathe in"—as the defendant was "[s]traddled" over her. The defendant then stepped back and asked the victim if she was okay. She told the defendant to "please leave." The defendant turned to walk away, and the victim ran across the road into a wooded area and hid underneath bushes. Unable to reach her mother on her cell phone, the victim called 911.

Four state troopers arrived at the scene—Troopers Theresa Freeman, Steven Caltica, Uliano, and D'Elia. Freeman spoke with the victim, who described her struggle with the defendant. Trooper Laura Kraus noted that the victim's shirt was grass-stained, her ponytail was askew, and her hair had twigs in it. Having received

information from the victim, and having had prior deal-ings with the defendant through other investigations, the troopers drove to the defendant's house. Freeman and Uliano went to the front door of the defendant's house. When the defendant came to the door, Freeman asked him, "Did you put your hands on a fifteen year old girl?" The defendant answered, "I didn't know she was fifteen," and he "dropped his head." Freeman and Uliano then placed the defendant under arrest and Uli-ano read the defendant his *Miranda* rights.[7]

D'Elia and Caltica took the defendant to the Troop L state police barracks. The defendant's pickup truck was towed to the Troop L barracks. D'Elia and Uliano spoke to the defendant at the police barracks and asked him if he would like to give a statement. The defendant said, "[W]hatever she said is true," and then said, "My life is over." D'Elia and Uliano then asked the defendant if he would like to give a written statement. The defen-dant answered, "yes," and the troopers handed him the statement form and instructed him to read the para-graph at the top and to write what happened. The defen-dant indicated that he understood the troopers' directions and made a written statement.[8] The troopers asked the defendant what his intentions had been, and he repeated several times, "I don't know, my life is over." At one point, the defendant told the troopers, "I have a problem." Later in the day on August 11, 2007, the victim went to the police barracks and identified the defendant's silver pickup truck to be the truck that had followed her.

Contrary to the defendant's argument that his actions were inconsistent with an intent to prevent the victim's liberation, his actions of asking the victim to get in his truck, chasing her when she refused his invitations, pulling her ponytail and forcing her to the ground, put-ting his hand over her mouth to suppress her screams, and attempting to pick her up are consistent with the elements of the charged crimes. On the basis of the victim's testimony, the jury reasonably could have found that the defendant possessed the requisite intent to prevent her liberation.[9] The victim testified that the defendant followed her during her run and asked her several times to get in his truck. The victim also testified that when she refused, the defendant chased her, forced her to the ground, attempted to pick her up, and when she fought back and screamed, put his hands over her mouth and told her to shut up. Although the defendant did not manage physically to place the victim in his truck, the jury reasonably could have inferred, in light of the defendant's immediately prior actions and state-ments—following the victim, asking the victim to get in his truck, chasing her when she did not obey, wrap-ping his arms around her and trying to pick her up, and putting his hands over her mouth and telling her to shut up—that he possessed the specific intent to prevent the victim's liberation immediately prior to and during

the struggle. There is sufficient evidence to support the defendant's conviction of kidnapping in the second degree.[10]

## II

The defendant's second claim is that the distinction between kidnapping in the second degree, § 53a-94 (a), and unlawful restraint in the first degree, § 53a-95 (a), is unconstitutionally vague as applied to him. He claims that the difference between the intent to abduct the victim to prevent her liberation—which is required for kidnapping in the second degree—and the intent to restrain the victim under circumstances that expose such other person to a substantial risk of physical injury—which is required for unlawful restraint in the first degree—is ambiguous. We disagree, in part because kidnapping in the second degree also contains a specific intent element, which, for the purpose of his vagueness argument, the defendant ignores.

We begin our analysis with our standard of review and the relevant legal principles with respect to a void for vagueness challenge. The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. *State* v. *Winot*, supra, 294 Conn. 758–59.

"[E]veryone is presumed to know the law and . . . ignorance of the law excuses no one from criminal sanction." *State* v. *Knybel*, 281 Conn. 707, 713, 916 A.2d 816 (2007). "A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague *as applied to him*, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited[11] or that [he was] the victim of arbitrary and discriminatory enforcement."[12] (Emphasis added; internal quotation marks omitted.) *Rocque* v. *Farricielli*, 269 Conn. 187, 204, 848 A.2d 1206 (2004).

## A

We first address the defendant's argument that § 53a-94 (a) is unconstitutionally vague because he was unable to determine whether his actions were criminal under § 53a-94 (a) or § 53a-95 (a).

"If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning."[13] (Internal quotation marks omitted.) Id. "[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused

cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws* v. *United States*, 325 U.S. 91, 102, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945); see also *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 342, 72 S. Ct. 329, 96 L. Ed. 367 (1952) ("requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of [a statute] would be so unfair that it must be held invalid").

"Section 53a-94 (a), by its plain terms, indisputably prohibits intentional, nonconsensual restraint of a person, by means of physical force, when that restraint is coupled with the intent to prevent that person's liberation. . . . It further is clear that the statutory definition of 'restraint' encompasses both movement of a person from one place to another and confinement of a person in the place where a restriction of movement commences."[14] (Citation omitted.) *State* v. *Winot*, supra, 294 Conn. 761. As our Supreme Court has repeatedly explained, the touchstone for determining whether the movement or confinement at issue constituted kidnapping was not its extensiveness, "but, rather, *whether it was accomplished with the requisite intent*, that is, to prevent the victim's liberation."[15] (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 532. Intent is a question of fact to be determined by the jury. As discussed in part I of this opinion, after a thorough review of the record, we conclude that sufficient evidence exists to support the jury's conclusion that the defendant had the intent to commit kidnapping—i.e., that the defendant's restraint of the victim was not merely incidental to his unlawful restraint, and uncharged assault, of the victim. The jury reasonably could have found that the defendant put his arms around the victim, tried to pick her up, and put his hand over her mouth to quiet her screams, with the purpose of restraining her and preventing her liberation. In such circumstances, § 53a-94 (a) is not unconstitutionally vague as applied to the defendant.

B

With respect to the defendant's claim that his restraint of the victim was relatively minor, we conclude that the present case is not one in which the defendant's restraint of the victim was so minimal or limited in time as to warrant a finding of constitutional vagueness. Our Supreme Court has repeatedly stated that there are no minimum time or distance requirements to establish an act of restraint within the meaning of the kidnapping statute. See, e.g., *State* v. *Winot*, supra, 294 Conn. 761–65. This principle, coupled with the prohibition in § 53a-94 of the act of restraint when it is accomplished with the specific intent of preventing the victim's liberation, defeats the defendant's claim that § 53a-94 is unconstitutionally vague as applied to his actions on August 11,

2007. The defendant's significant restraint of the victim, coupled with evidence of intent discussed in part I of this opinion, so clearly exceeds the de minimis restraint posited in *Salamon*[16] that further discussion is not warranted.

C

Last, we examine the defendant's claim that § 53a-94 is unconstitutionally vague as applied to him because he was the victim of arbitrary and discriminatory law enforcement. To prevent arbitrary and discriminatory enforcement, "laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." (Footnote omitted; internal quotation marks omitted.) *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).

Here, the defendant does not argue that he was subject to arbitrary and discriminatory law enforcement by being charged with a crime at all; rather, he argues that he was subject to arbitrary and discriminatory enforcement because he was overcharged with the more serious of two virtually identical crimes. We disagree. After a thorough review of the record, and in light of our conclusion that sufficient evidence of the defendant's intent to commit kidnapping exists, we conclude that the defendant was not subject to arbitrary and discriminatory enforcement of § 53a-94.

The defendant's argument that there is no meaningful distinction between § 53a-95, unlawful restraint in the first degree, and § 53a-94, kidnapping in the second degree, such that law enforcement's discretion is unfettered, does not withstand scrutiny. Put simply, kidnapping in the second degree includes as an element the specific intent either to secrete the victim in a place where he will not likely be found or to use or threaten to use physical force. Unlawful restraint in the first degree contains no such specific intent element. Exposing a victim to a substantial risk of injury, an element of unlawful restraint in the first degree, is different from the specific intent element of kidnapping in the second degree.[17]

D

Finally, we note that our disposition of this matter "is informed by the understanding that the fundamental purpose of the void for vagueness doctrine is to ensure fair warning in order to avoid traps for the innocent." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Winot*, supra, 294 Conn. 770. The defendant has made no plausible argument, nor can we conceive of one, that on August 11, 2007, he acted in reliance on the belief that his conduct was lawful, or that a person of ordinary intelligence would have no reason to know

that he was engaging in prohibited conduct. See *State
v. Ayala*, supra, 133 Conn. App. 526. Rather, the defen-
dant in his brief argues only that he was charged improp-
erly, i.e., that he ought to have been charged with assault
and not kidnapping and attempted kidnapping, and not
that his conduct was not criminal.[18] For purposes of
vagueness analysis, this argument is not persuasive. See
*Chapman* v. *United States*, 500 U.S. 453, 467–68, 111
S. Ct. 1919, 114 L. Ed. 2d 524 (1991) (rejecting vagueness
claim and noting that "whatever debate there is [over
the meaning of the statute] would center around the
appropriate sentence and not the criminality of the con-
duct"); *United States* v. *White*, 882 F.2d 250, 252 (7th
Cir. 1989) ("Provided that conduct is of a sort widely
known among the lay public to be criminal . . . a per-
son is not entitled to clear notice that the conduct
violates a *particular* criminal statute. It is enough that
he [or she] knows that what he [or she] is about to do
is probably or certainly criminal." [Emphasis in origi-
nal.]). In such circumstances, a defendant does not meet
the heavy burden of showing that a statute, as applied
to the facts of his case, is unconstitutionally vague. On
the basis of the foregoing analysis, we conclude that
§ 53a-94, as applied to the defendant's conduct, is not
unconstitutionally vague.

### III

The defendant also claims that his cumulative convic-
tion of kidnapping in the second degree and attempted
kidnapping in the second degree violate the constitu-
tional prohibitions against double jeopardy. Specifi-
cally, the defendant argues that pursuant to our
Supreme Court's recent decision in *State* v. *Polanco*,
308 Conn. 242, 61 A.3d 1084 (2013), the conviction of
only one of the kidnapping counts can stand and the
other must be vacated. At oral argument before this
court, the state agreed with the defendant regarding
this claim. We have reviewed the record and agree that
*Polanco* governs this case. We therefore remand this
case to the trial court with direction to vacate the defen-
dant's conviction of attempted kidnapping in the sec-
ond degree.

### IV

The defendant's final claim is that the court abused
its discretion in ordering sex offender registration with
respect to his conviction of unlawful restraint in the
first degree and risk of injury to a child. Specifically,
the defendant argues that the court's finding that he
committed such offenses "for sexual purposes" was
clearly erroneous; therefore, the court abused its discre-
tion in ordering sex offender registration. The defen-
dant does not challenge the court's order that he register
as a sex offender for his conviction of kidnapping in
the second degree.

General Statutes § 54-251 provides for mandatory sex

offender registration upon conviction of certain criminal offenses. It provides in relevant part: "[a]ny person who has been convicted . . . of a criminal offense against a victim who is a minor . . . and is released into the community on or after October 1, 1998, *shall*, within three days following such release . . . register such person's name, identifying factors, criminal history record, residence address and electronic mail address, instant message address or other similar Internet communication identifier, if any, with the Commissioner of Emergency Services and Public Protection . . . and shall maintain such registration for ten years . . . ." (Emphasis added.) General Statutes § 54-251 (a). General Statutes § 54-250 (2) (B) defines "[c]riminal offense against a victim who is a minor," in relevant part, as "a violation of . . . section . . . 53a-94 . . . provided the court makes a finding that, at the time of the offense, the victim was under eighteen years of age . . . ."

The following additional facts are relevant to the defendant's claim. During the defendant's sentencing proceeding, with respect to the defendant's conviction of kidnapping in the second degree, the court found that the victim was under the age of eighteen. The court then stated that "by operation of law," § 54-251 (a) required that the defendant register as a sex offender for a period of ten years. Then, with respect to the defendant's conviction of unlawful restraint and risk of injury to a child, the court made a further finding "that those offenses were committed for sexual purposes," and ordered the defendant to register as a sex offender for the maximum period of ten years pursuant to General Statutes § 54-254.

Because we find that there is sufficient evidence supporting the defendant's conviction of kidnapping in the second degree; see part I of this opinion; and because the court found that the victim was under the age of eighteen at the time the offense was committed, § 54-251 (a) mandates that the defendant, upon release, register as a sex offender for a period of ten years. Therefore, there is no basis for this court to overturn the trial court's order that the defendant register as a sex offender for a period of ten years pursuant to § 54-251, and we need not reach the issue of whether sex offender registration was appropriate pursuant to § 54-254 with respect to the conviction of the other two offenses. We affirm the court's order that the defendant register as a sex offender for a period of ten years following his release from imprisonment.

The judgment is reversed only as to the conviction of attempt to commit kidnapping in the second degree and the case is remanded with direction to vacate that conviction; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The defendant was also convicted of unlawful restraint in the first degree in violation of General Statutes § 53a-95 and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). He does not appeal from the conviction of those crimes.

[2] The woman resumed running in the area in March, 2007, after taking a number of months off. She usually ran with a friend, although occasionally she ran alone. After her first three days of jogging, she observed the defendant's truck engaged in the same type of action: passing by her several times, as though the driver was watching her, until she got into her car and left. On March 30, 2007, after watching the defendant's truck pass by her six times over a three-quarter of a mile stretch, she began to feel "very nervous" and "very uncomfortable," and "started sprinting back to [her] car . . . ." While sprinting back to her car, she saw a friend pass by her in his car and wave to her. She flagged him down, got in his car, and he drove her to her car. When she got to her car, she drove to the police barracks and filed a complaint. She gave up running in the area because of the defendant's behavior.

[3] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] The habeas court granted the defendant's habeas petition on October 14, 2011. This court granted the defendant's motion to file a late appeal and motion for waiver of fees.

[5] The defendant also claims that even if this court should conclude that there was sufficient evidence for the jury to have found that he intended to abduct the victim, "the kidnapping convictions must be vacated because the defendant voluntarily abandoned any such effort." Because we find that there was sufficient evidence to uphold the conviction of kidnapping in the second degree, we decline to address the defendant's argument that he abandoned the crime of attempt to commit kidnapping in the second degree.

[6] The defendant has not claimed on appeal that there was insufficient evidence of the use of physical force.

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] The defendant's statement reads in pertinent part: "I was driving; ask a girl if she wanted a ride, she said no. I ran after her, she fell in the grass screaming. She said leave me alon[e]. I left. I didn't mean to harm her."

[9] Even if the defendant ultimately backed off and appreciated the aberrant nature of his behavior, there quite clearly was sufficient evidence to support the element of intent just prior to and during the physical struggle in which, it can be inferred, he tried to force the victim into his truck.

[10] The defendant also argues that there is insufficient evidence to support his conviction of attempted kidnapping in the second degree. Section 53a-49 defines the elements of criminal attempt to be the necessary intent for the completed crime and the taking of a substantial step in furtherance of the intended completed crime. Because we find that there is sufficient evidence of the defendant's intent to prevent the victim's liberation, we also find that there is sufficient evidence to support the conviction of attempted kidnapping in the second degree. We need not address this specific claim further.

[11] "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a *reasonable opportunity to know what is prohibited*, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." (Emphasis added.) *Grayned* v. *Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "[A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." *Baggett* v. *Bullitt*, 377 U.S. 360, 367, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964).

[12] To prevent arbitrary and discriminatory enforcement, "laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "[A] legislature [must] establish minimal guidelines to govern law enforcement." (Internal quotation marks omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

[13] "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical

difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten* v. *Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972); see also *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 322, 732 A.2d 144 (1999) ("[b]ecause perfect precision is neither possible nor required . . . the [vagueness] doctrine does not mandate the invalidation of all imprecisely drafted statutes" [internal quotation marks omitted]).

[14] In *State* v. *Salamon*, supra, 287 Conn. 531, our Supreme Court reasoned, in part, that "because the statutory definitions of the terms 'restrain' and 'abduct' contain no time or distance specifications, the offense of kidnapping does not require proof that the victim was confined for any minimum period of time or moved any minimum distance." Id., 531–32.

[15] In several instances, our Supreme Court has applied these principles to uphold kidnapping convictions that involved confinement of the victim for short periods of time and/or involved movement of the victim of a rather brief distance. See, e.g., *State* v. *Tweedy*, 219 Conn. 489, 503, 594 A.2d 906 (1991) (moving victim throughout her apartment during robbery, sexual assault); *State* v. *Jones*, 215 Conn. 173, 182, 575 A.2d 216 (1990) (moving victim across and off of road); *State* v. *Vass*, 191 Conn. 604, 606, 614–15, 469 A.2d 767 (1983) (moving victim from front of store to back stockroom during sexual assault); *State* v. *Bell*, 188 Conn. 406, 409, 416, 450 A.2d 356 (1982) (confining victims in freezers for two to fifteen minutes during robbery); *State* v. *Lee*, 177 Conn. 335, 344, 417 A.2d 354 (1979) (moving victim from stairway to bedroom and detention there for fifteen minutes during robbery); *State* v. *Hill*, 58 Conn. App. 797, 802–803, 755 A.2d 919 (moving victim down driveway and under stairwell during sexual assault), cert. denied, 254 Conn. 936, 761 A.2d 763 (2000).

At times, however, our Supreme Court has acknowledged that there conceivably could be "factual situations in which charging a defendant with kidnapping based [on] the most miniscule [movement or duration of confinement] would result in an absurd and unconscionable result . . . ." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 532 n.21; see also *State* v. *Winot*, supra, 294 Conn. 764. "As our case law interpreting [the kidnapping] statutes has evolved, however, it is apparent that any such limitation on the reach of our kidnapping statutes is reserved for the rare factual scenario in which the restraint is so minimal that the statute would be unconstitutionally vague as applied to that scenario." *State* v. *Salamon*, supra, 528 n.17.

The defendant argues that the facts of this case present such a situation. We disagree. The defendant's restraint of the victim was coupled with strong evidence of his intent to prevent the victim's liberation; therefore, § 53a-94 (a), as applied to the defendant, afforded him adequate notice that his behavior was prohibited.

[16] In *Salamon*, our Supreme Court acknowledged that there conceivably could be "factual situations in which charging a defendant with kidnapping based [on] the most miniscule [movement or duration of confinement] would result in an absurd and unconscionable result . . . ." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 532 n.21.

[17] A slightly more subtle distinction exists between the specific intent required to prevent liberation, required by kidnapping, and the circumstance that restraint be accomplished in such a way as to interfere substantially with liberty, required by unlawful restraint.

[18] The defendant's statements to state troopers that "whatever she said is true," and, "my life is over," provide clear manifestations of his understanding that his conduct toward the victim was criminal. See *State* v. *Kirby*, 137 Conn. App. 29, 44, 46 A.3d 1056 ("[a defendant is] not entitled to clear notice that his conduct violate[s] a particular criminal statute"), cert. denied, 307 Conn. 908, 53 A.3d 222 (2012); *State* v. *Winot*, supra, 294 Conn. 770–71. The defendant's argument that § 53a-94 is unconstitutionally vague as applied to him because he was unable to tell whether his actions violated § 53a-94 or § 53a-95 must fail because our law requires notice only that one's actions are criminal and does not require notice that one's actions violate a particular criminal statute.